George VOILAS, et al., Plaintiffs,

v.

**GENERAL MOTORS CORP., et al., Defendants.**

No. Civ.A. 95–487(GEB).

United States District Court, D. New Jersey.

Nov. 1, 1999.

**454**

Jerald R. Cureton, Cureton, Caplan & Clark, Mount Laurel, NJ, for plaintiffs.

Linda B. Celauro, Carpenter, Bennett & Morrissey, Newark, NJ, for defendants.

## MEMORANDUM

WOLFSON, United States Magistrate Judge.

Presently before the Court is a motion, *in limine*, by defendant, General Motors Corporation ("GM"), seeking to preclude the testimony and reports of Frank D. Tinari, Ph.D., plaintiffs' proffered liability and punitive damages expert. Specifically, GM seeks to preclude Dr. Tinari's July 2, 1999, liability report and supplement to that report, as well as his July 16, 1999, punitive damages report. The Court has reviewed the moving, opposition, reply, and supplemental papers submitted by all the parties, and heard oral argument on September 7, 1999. For the following reasons, GM's motion is granted only with respect to Dr. Tinari's punitive damages report, and denied in all other respects.

## I. *Background*

The plaintiffs, over 200 former GM hourly workers, filed a complaint on January 30, 1995, and an amended complaint on July 19, 1999, against GM and several other defendants. Plaintiffs allege that GM fraudulently announced on December 3, 1992, that its Trenton plant would close but failed to announce, prior to March 3, 1993, that it was exploring sales possibilities for the plant, with the motive to compel plaintiffs to select a voluntary early retirement pursuant to a collectively-bargained Special Accelerated Attrition Agreement ("SAAA") over other collectively-bargained options.

By order dated June 21, 1999, this Court granted GM's motion to preclude the report of plaintiffs' liability expert, Dr. Samuel J. Kursh, but granted plaintiffs leave to file a liability expert report on: "the economic analysis of the options of closing the Trenton plant, selling the Trenton plant, keeping the Trenton Plant open, or delaying a closing of the Trenton plant; and (2) the economic value of the benefits available to the hourly employees of the Trenton Plant." *Order dated June 21, 1999.*

Plaintiffs thereafter produced a liability report, dated July 2, 1999, along with a qualifications profile of Dr. Frank Tinari, analyzing the following issues: "(1) GM's Analysis of Disposition Plans for the Trenton Plant" and "(2) Special Accelerated Attrition Agreement (SAAA) vs. Remaining with GM." *Celauro Certification*, Exhibit "A." Plaintiffs subsequently produced another report by Dr. Tinari, dated July 16, 1999, opining "on the range of reasonable value of punitive damages in this matter . . . ." *Celauro Certification*, Exhibit "C." On August 3, 1999, during the taking of Dr. Tinari's deposition on both reports, Dr. Tinari also produced an undated supplemental report to his July 2, 1999, liability report. *See Celauro Certification*, Exhibit "B."

GM's present motion to preclude Dr. Tinari's reports is based on the expert's lack of qualifications, as well as the reports' lack of relevance, lack of methodology, and prejudicial value. *See Defendant's Brief in Support of Motion* at 2. GM moves to preclude the supplemental liability report not only on the same grounds it seeks to preclude the July 2, 1999, report, but also on the grounds that it was provided over a month past the due date set by this Court's order. *See ibid.*

*Discussion*

### I. Qualifications Analysis of Dr. Tinari Regarding his Liability Report

■ The Court initially notes that this motion is being decided without a Federal Rule of Evidence 104 hearing.[1] Cognizant of the Third Circuit's recent reaffirmation in *Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 417 (3d Cir.1999), of the importance of conducting *in limine* hearings under Rule 104 when making the reliability determinations required by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Court is nonetheless satisfied that such a hearing is unnecessary under the present circumstances. In fact, upon the Court's inquiry at oral argument on September 7, 1999, the Court was informed of the parties' shared belief that the record was complete and that the matter was ripe for adjudication by this Court without a Rule 104 hearing. The Court further notes that Dr. Tinari has been previously and extensively deposed, the transcripts of which were provided to the Court in connection with this motion. As such, *Padillas* is distinguishable in that the district court there excluded the proposed expert's report—submitted in opposition to a summary judgment motion—without providing the expert the opportunity to explain certain flaws in his methodology. Unlike *Padillas*, the expert here had ample opportunity at his deposition to explain, and even correct, certain deficiencies GM brought to his attention. *Cf. In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 854 (3d Cir.1990) (reversing a district court's grant of summary judgment in defendants' favor because in excluding expert evidence under Federal Rule of Evidence 703, the court

failed to "provide[ ] the plaintiffs with sufficient process for defending their evidentiary submissions."). Because this Court has before it a sufficient factual record upon which to base its conclusion, and because a Rule 104 hearing would not have brought any new information to light, the Court is satisfied that such a hearing is unwarranted.

GM first attacks Dr. Tinari's qualifications as an expert in the present matter. Specifically, GM contends that while Dr. Tinari regards himself as an economic expert with primary experience in calculating economic loss suffered by either personal injury plaintiffs or employee plaintiffs, he lacks any "prior experience or expertise with respect to evaluating business plans or options, or any expertise on the automotive industry from an economic perspective." *Id.* at 5. GM further maintains that Dr. Tinari conceded that he lacks experience in "valuing options available to employees under collective bargaining agreements—with the limited exception of attaching a value to a benefit in an economic loss analysis," which, GM argues, is not the analysis Dr. Tinari conducted in his liability report. *Id.* at 5–6. As such, GM avers that although Dr. Tinari is an economist, he does not comply with Federal Rule of Evidence 702's requirement that a witness may give expert testimony if qualified as an expert by "knowledge, skill, experience, training, or education . . . ." to the extent he purports to evaluate GM's business options with respect to the Trenton plant as well as plaintiffs' options under the collective bargaining agreement. *Id.* at 6–7.

Federal Rule of Evidence 702[2] has three major requirements: (1) the prof-

---

1. Pursuant to Federal Rule of Evidence 104(a), "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges."

2. In its entirety, Rule 702 provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." FED.R.EVID. 702.

fered witness must be an expert; (2) the expert must testify to scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact. *See United States v. Velasquez,* 64 F.3d 844, 849 (3d Cir.1995). Because Federal Rule of Evidence 104(a) requires district courts to make preliminary determinations "concerning the qualification of a person to be a witness, [and] ... the admissibility of evidence," a district court, when faced with a proffer of expert testimony, must make a preliminary determination as to all of these elements of Rule 702. *Ibid.* These preliminary determinations are intended to ensure the reliability of the expert testimony as well as its relevance. *See ibid.*

■ To ascertain whether a proposed expert is qualified to act as a witness at trial, courts are directed to engage in a two-step inquiry. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence,* at 55 (1994). First, the court should determine whether the proffered expert has minimal educational or experiential qualifications in a field that is relevant to a subject that will assist the trier of fact. *See ibid.* Second, if the expert passes this threshold test, the court should further compare the expert's area of expertise with the particular opinion the expert seeks to offer. *See ibid.* The expert should be permitted to testify only if the expert's particular expertise, however acquired, enables the expert to give an opinion that is capable of assisting the trier of fact. *See ibid.*

■ While on the one hand, the Third Circuit has held that " 'a broad range of knowledge, skills and training qualify an expert as such' and [courts must] 'eschew[ ] imposing overly vigorous require-

ments of expertise,' " the inquiry has not been reduced to a mere formality. *Velasquez, supra,* 64 F.3d at 849 (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 741 (3d Cir.1994), *cert. denied sub nom. General Elec. Co. v. Ingram,* 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995)). Thus, the determination of whether an expert is qualified to testify about a particular topic is predominantly a fact-specific question governed by the unique circumstances in each case. For example, in *Surace v. Caterpillar, Inc.,* 111 F.3d 1039 (3d Cir.1997), the proposed expert was an electromechanical engineer, with a degree in electrical engineering, and twenty years of experience with Mack Trucks, who sought to testify about habituation. The court held that "[a]lthough the Rule [702] mandates a policy of liberal admissibility, both with respect to the substantive as well as the formal qualification of experts," the proffered expert did not meet the standard because he did not have the requisite training or experience in the particular area for which he was being offered to give testimony. *Id.* at 1055. Conversely, in *Hammond v. International Harvester Co.,* 691 F.2d 646, 653 (3d Cir.1982), based upon the particular circumstances of that case, the Third Circuit permitted an engineer with sales experience in automotive and agricultural equipment, who also taught high school automobile repair, to testify in a products liability action involving tractors.[3] Accordingly, the Third Circuit has warned that "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook v. Lykes*

---

**3.** Similarly, Federal Rule of Evidence 701, which applies to the admission of opinion testimony by lay witnesses, also requires courts to assess the proposed witness' knowledge. Specifically, Rule 701 "contemplates admission of lay opinions rationally based on personal knowledge so as to be helpful to the trier of fact," and "was primarily designed to allow lay individuals to express opinions that are in reality only a shorthand statement of facts." *Asplundh Mfg. Div. v. Benton Harbor Eng'g,* 57 F.3d 1190, 1193 (3d Cir.1995). Rule 701 has also been interpreted to allow "individuals not qualified as experts, but possessing experience or specialized knowledge about particular things, to testify about technical matters." *Id.*

*Bros. Steamship Co., Inc.*, 80 F.3d 777, 782 (3d Cir.1996).[4]

The Third Circuit has clarified that general knowledge or practical experience is a sufficient basis on which to qualify an expert. Indeed, the Third Circuit noted that a witness can qualify as an expert "under Rule 702 on the basis of practical experience alone, and a formal degree, title, or educational specialty is not required." *Lauria v. National R.R. Passenger Corp.*, 145 F.3d 593, 599 (3d Cir.1998). In the *Lauria* case, the circuit court found that the expert testimony of a veteran Amtrak employee of twenty years, on the subject of Amtrak's responsibility to "inspect and maintain the track in a safe condition," was improperly excluded. *Ibid.; see also Waldorf v. Shuta*, 142 F.3d 601, 627 (3d Cir. 1998) (finding a proposed expert witness' generalized knowledge or practical experience may be sufficient to qualify him as an expert).

■ With this framework in mind, this Court must first assess Dr. Tinari's qualifications to testify as to the issues in this case. The Court notes that Dr. Tinari's qualifications profile highlights an extensive and distinguished professional career in the field of economics. *See Celauro Certification*, Exhibit "A" at 22–25. Dr. Tinari, currently a Professor of Economics at Seton Hall University, received his B.S., M.A., and Ph.D. in Economics from Fordham University, and has, since that time, served in numerous academic and professional positions and has been the recipient of several honors and awards in his field. *See id.* at 22–23. Dr. Tinari is also currently involved as a member of several national economic associations. *See id.* at 24. Moreover, Dr. Tinari has provided expert testimony at over 250 trials, arbi-

tration hearings, and depositions, and has lectured at various seminars on issues such as proving economic damages and the use of economic experts to calculate lost wages and benefits. *See id.* at 23. In addition to authoring "[n]umerous economic loss appraisal reports for use in litigation regarding economic daniages[,]" Dr. Tinari has also written and published various articles addressing economic issues such as the role of the economic expert, ethical issues for forensic economists, and the valuation of economic damages in the context of personal injury and wrongful death cases. *Id.* at 23–24. Dr. Tinari also currently serves as an editorial reviewer for four economic and business journals. *See id.* at 22.

This Court finds that Dr. Tinari qualifies to testify as an expert on the issues addressed in his liability report. Indeed, the Court is satisfied that Dr. Tinari has extensive experience in the area of economics and is qualified to review and summarize GM's financial plans regarding its decision to sell, close, or keep the Trenton plant open, as well as to evaluate the options available to plaintiffs from December 1992 through March 1993. Contrary to GM's assertion, the fact that Dr. Tinari does not have specific experience in the automotive industry or in creating or evaluating business plans does not impact upon his qualifications to review such plans and to summarize in a concise, easy to understand fashion GM's own analyses of the business options available to it. The Court further notes that notwithstanding its belief that Dr. Tinari may not be the best qualified expert to render testimony on this particular issue, his testimony is nonetheless admissible and the weight to be accorded that testimony is left to the province of the

---

4. In *Holbrook*, the Third Circuit overturned the district court's exclusion of the treating physician's testimony because the proposed expert was not an oncologist or a specialist in definitive cancer diagnosis. *Holbrook, supra*, 80 F.3d at 781. The court found that under the particular circumstances of that case, including the fact that the proposed expert was plaintiff's treating physician, and in light of

the liberal standard governing the qualifications of an expert witness, the expert should have been permitted to testify. *See id.* at 782. Specifically, the court explained that "[t]he Federal Rules of Evidence are meant to instruct the district courts in the sound exercise of their discretion in making admissibility determinations and should not be interpreted as exclusionary rules." *Id.*

jury. *See Holbrook, supra,* 80 F.3d at 782 ("witnesses may be competent to testify as experts even though they may not, in the court's eyes, be the 'best' qualified. Who is 'best' qualified is a matter of weight upon which reasonable jurors may disagree.").

Similarly, in the context of valuing benefits under collective bargaining agreements Dr. Tinari's deposition testimony reveals that he has evaluated numerous wage and benefit provisions in other agreements as well as in collective bargaining agreements—albeit only from the perspective of an economic loss analysis, an analysis different from the one conducted in his liability report. *See Celauro Certification,* Exhibit "D" at 23. Logically, the review of such agreements for purposes of calculating losses requires an understanding of the value of the benefits contained therein. It is thus inconsequential to the present analysis that Dr. Tinari is neither an expert in collective bargaining agreements nor in the automotive industry when his liability report merely evaluates the wages and benefits contained in the collective bargaining agreement, and in no way requires him to determine any issues that would necessitate specific expertise of collective bargaining agreements [5] or the automotive industry. Finally, as plaintiffs point out in their brief, GM's attempt to draw a distinction between valuing loss in collective bargaining agreements, which Dr. Tinari has experience doing, and valuing various benefit options is futile. Certainly, analyzing the value and income stream that would have resulted had plaintiffs accepted the SAAA and comparing that to the income stream that would have resulted had plaintiffs foregone the SAAA and continued working until the plant closed and then accepted other benefits packages is not at all dissimilar "to valuing the income stream of a litigant's loss as the result of some injury or some adverse employment decision (i.e., the value of loss to a person had X not

occurred)." *Plaintiffs' Brief in Opposition to Motion* at 7.

Consistent with the Third Circuit's mandate that trial courts should not impose overly rigorous requirements to establish expertise, this Court finds that Dr. Tinari has the requisite training and experience with respect to providing a report and testimony on the value of benefits and wages available to plaintiffs under various options. *See Velasquez, supra,* 64 F.3d at 849. Dr. Tinari's qualifications profile depicts an economist well-versed in valuing plaintiffs' wages and benefits and in determining economic damages, issues highly relevant to plaintiffs' theory of liability against GM. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence,* at 55 (1994). As such, Dr. Tinari's expertise in this particular area will certainly render him capable of assisting the jury with the liability issues of the present matter. *See id.* The Court thereby finds that pursuant to Federal Rule of Evidence 702, Dr. Tinari qualifies as an expert for the purpose of clarifying the liability issues presented in this case.

## II. The Daubert Analysis of Dr. Tinari's Proposed Trial Testimony

Having established that Dr. Tinari is qualified to testify with respect to his liability report, the Court will next determine whether such report and opinions are reliable and trustworthy.

In arguing that Dr. Tinari's liability report is unreliable and must therefore be excluded, GM initially maintains that Dr. Tinari utilized no methodology whatsoever in producing the report. *See Defendant's Brief in Support of Motion* at 10. GM points out that Dr. Tinari "merely reviewed GM's own analyses and reiterated the same, without bringing any economic analysis to the task" and, as such, his liability report does not contain any analysis of GM's business options. *See ibid.* GM thus concludes that Dr. Tinari's re-

---

**5.** For example, Dr. Tinari was not asked to determine the validity or fairness of the collective bargaining agreement nor whether the agreement complied with industry standards.

port, which only reiterates information that would be available to the trier of fact, is neither helpful nor appropriate "as plaintiffs do not require expert testimony simply to set forth an analysis already performed by GM." *Ibid.*

In response, plaintiffs concede that Dr. Tinari did not "per se" conduct an economic analysis in determining that offering the SAAA allowed GM to reduce its paid workforce and labor costs, thereby making the plant a more attractive sale to prospective buyers. *Plaintiff's Brief in Opposition to Motion* at 9. Rather, plaintiffs maintain that Dr. Tinari's "methodology" included reviewing GM's numerous economic analyses and bringing them together in a clear and straightforward manner, and that such "methodology" does not readily lend itself to the *Daubert* factors. *See id.* at 9–10. In addition, plaintiffs argue that Dr. Tinari used his economics experience to review financial data that would otherwise be confusing to the jury and to explain GM's financial analyses. *See id.* at 10.

GM further argues that Dr. Tinari's methodology with respect to his valuation of plaintiffs' options is unreliable in that he failed to consider all options available to plaintiffs, such as transfer and relocation opportunities. *See Defendant's Brief in Support of Motion* at 10–14. GM points to portions of Dr. Tinari's deposition testimony wherein he admitted being aware of other options available to plaintiffs, but failed to include them in his analysis. *See id.* at 11–14.

To this argument, plaintiffs respond that Dr. Tinari reviewed the transfer options but discarded them as not viable. *See Plaintiffs' Brief in Opposition to Motion* at 10. Plaintiffs also note that GM is not attacking the methodology employed by Dr. Tinari in calculating the values of the SAAA and the SUB/GIS[6] benefits but, rather, is attacking the economist's choice to discard certain options available to plaintiffs. This argument goes to the

weight to be accorded Dr. Tinari's opinion on this issue, rather than its admissibility.

Finally, GM maintains that Dr. Tinari's methodology is unreliable as a result of the "inconsistencies between his verbalized factual assumptions and calculations with respect to healthcare benefits available to retirees." *Defendant's Brief in Support of Motion* at 14. GM contends that although Dr. Tinari agreed in his deposition testimony that his factual assumptions included the premise that all retirement plans under GM's pension plan carried the same level and term of healthcare coverage, he failed to attribute in his calculations any value to healthcare benefits for "mutually satisfactory retirement" ("MSR") for individuals retiring after plant closing, but attributed value to healthcare benefits from MSRs under the SAAA. *See ibid.*

In response, plaintiffs maintain that Dr. Tinari did account for the healthcare benefits in accordance with his understanding of the documents he reviewed and upon which he relied. *See Plaintiff's Brief in Opposition to Motion* at 11. Specifically, plaintiffs point to Dr. Tinari's explanation that plaintiffs who were eligible for an MSR at the time of plant closing would have received healthcare benefits so long as they retired from active status. *See ibid.; Tinari Deposition* at 155–56. Dr. Tinari therefore recalculated—and submitted to GM as a supplement to his liability report—the valuations for three plaintiffs who would have been at least fifty-five years old (the minimum age of eligibility for an MSR pension) to include healthcare benefits for such individuals. *See Tinari Deposition* at 153–57. Dr. Tinari explained that in his original calculations, he operated under the assumption that all plaintiffs collected SUBs for twenty-five months and then accepted an MSR. *See id.* at 155–56. Dr. Tinari thus reasoned that because the plaintiffs would not be considered active employees while receiving

---

**6.** "SUB" refers to supplemental unemployment benefits; "GIS" refers to guaranteed income stream.

SUB/GIS benefits, they would not be entitled to health care benefits at retirement. *See ibid.*

■ In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court outlined the standards and reasoning that a district court must apply in determining whether expert scientific testimony is admissible at trial. The Third Circuit Court of Appeals has interpreted *Daubert* to define the district court's role as that of "gatekeeper." *Paoli, supra,* 35 F.3d at 732. Thus, it is the district court's duty to "assure that the scientific methodology upon which the expert opinion is founded is reliable, i.e., that the expert's conclusion is based on good grounds (the methods and principles of science)." *Ibid.*

■ Once the proposed expert has overcome the threshold "qualification" requirement, the court must then assess the reliability and trustworthiness of the expert's testimony by evaluating whether it is based upon scientific, technical, or other specialized knowledge. In *Daubert,* the Supreme Court held that a district court, when presented with a proffer of expert "scientific" testimony, must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid," by considering all relevant factors that may bear on the reliability of the proffered evidence. *Daubert, supra,* 113 S.Ct. at 2796–97.

■ Scientific evidence is deemed sufficiently reliable if the expert has "good grounds" for his or her testimony, such that the expert's opinions are "based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Paoli, supra,* 35 F.3d at 742. *Daubert* offers the following nonexclusive list of factors for consideration: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; (8) the non-judicial uses to which the method has been put. [*Velasquez, supra,* 64 F.3d at 849 n. 8.] The Third Circuit has cautioned against applying the reliability requirement too strictly, *United States v. Downing,* 753 F.2d 1224, 1235 (3d Cir.1985), explaining that "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence." *Paoli, supra,* 35 F.3d at 742; *see also Velasquez, supra,* 64 F.3d at 845 (finding that a law professor's testimony as to the lack of reliability of handwriting analysis was improperly excluded); *Lauria, supra,* 145 F.3d at 599 (holding that the trial court improperly excluded expert testimony on the subject of track maintenance from an Amtrak employee of twenty years). In the final analysis, "[t]he touchstone of Rule 702 ... is the helpfulness of the expert testimony, *i.e.,* whether it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Downing, supra,* 753 F.2d at 1235 (quoting FED.R.EVID. 702).

Recently, the United States Supreme Court in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999), addressed the issue of whether the *Daubert* analysis applies to the testimony of engineers and other experts who are not scientists. The Supreme Court concluded that "*Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Ibid.* (*quoting* FED. R.EVID. 702). Writing for the majority, Justice Breyer further explained that trial courts may consider one or more of the enumerated factors stated in *Daubert* when judging the reliability of experts who

are non-scientists. *See ibid.* However, the Court reminded district courts of the test's flexibility and instructed that the *Daubert* factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Ibid.*

As an initial matter, the Court notes that the *Daubert* factors do not always fit neatly into or easily translate in the context of nonscientific testimony. In matters such as the present one, where applying the *Daubert* factors does not appear workable, the Court is guided by *Kumho*'s forewarning that in certain cases the "relevant reliability inquiry concerns may focus upon personal knowledge or experience." *Id.* at 1175; *see also* Timothy Perrin, *Expert Witness Testimony: Back to the Future*, 29 U.RICH.L.REV. 1389, 1457 (1995) (recognizing that in this context, "the qualifications of the expert will be of particular importance. This is so because in the nonscientific world, theories are often not subject to testing or experimentation. Although the focus of the inquiry must still be on verification of the expert's methodology, the inquiry is more difficult because much nonscientific expert testimony is based on the experience of the expert, instead of experimentation."). As such, much of the following analysis will hinge on Dr. Tinari's experience and qualifications.

■ Turning to GM's arguments, this Court disagrees that Dr. Tinari's liability report is unreliable because he employed no particular methodology, but merely reviewed GM's own analyses of disposition plans for the Trenton plant. Indeed, an experienced economist's clarification and summary of a large corporation's business plans could certainly prove helpful to the average juror who presumably lacks such experience in and knowledge about complex financial matters, even if doing so does not require employing any particular methodology but simply a straightforward review of the corporation's data. See *Downing, supra*, 753 F.2d at 1235 (quoting Federal Rule of Evidence 702 and recognizing that "[t]he touchstone of Rule 702

... is the helpfulness of the expert testimony, *i.e.*, whether it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' "). In this context of reviewing and summarizing GM's business plans, the Court is satisfied that Dr. Tinari's report is sufficiently reliable, entitling him to testify as to his review and summary of GM's financial analyses. *Cf. Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir.1997) (explaining that in the context of medical testimony, "it is perfectly acceptable, in arriving at a diagnosis, for a physician to rely on examinations and tests performed by other medical practitioners[ ]" and the fact that the physician did not himself perform a physical examination does not necessarily diminish his opinion).

The Court notes Dr. Tinari's supposition that "to make the sale of the facility attractive, GM had to reduce/eliminate the JOBs Bank," *Celauro Certification*, Exhibit "A" at 2–3, and his further opinion that, "On the surface it appears that elimination of 400 employees (via SAAA), enabled GM to deploy the JOB Bank employee to open positions within the plant. Had GM closed the facility, they would have had to continue to fund the JOB Bank at a significant expense." *Id.* at 3. Although Dr. Tinari's transition from the premise that selling the plant was the "superior financial option" to the conclusion that in order to make that option more attractive, GM had to reduce or eliminate the JOB Bank, appears facially logical, Dr. Tinari does not set forth in his report whether he considered, and ruled out, other potential ways by which GM could have made sale of the plant more attractive to prospective buyers. This omission does not, however, preclude this testimony on reliability grounds, but rather is proper fodder for cross-examination, and the weight to be accorded Dr. Tinari's opinion will properly rest with the jury. It is the function of the adversarial system to bring out through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. . . ." whether the

testimony is wanting in any respect. *Daubert, supra*, 113 S.Ct. at 2798.

The Court also finds wanting GM's argument that Dr. Tinari's liability report is unreliable because it purports to value plaintiffs' options from December 1993 through March 1993, yet fails to include other available options under the collective bargaining agreement, including transfers and relocation. While acknowledging that Dr. Tinari's proffered explanation for this exclusion of options—that a number of other plants were also closing and, thus, the more senior employees would have little, if any, opportunity to transfer—was an assumption that did not preclude the economist from exploring those employment opportunities,[7] the Court, mindful that the reliability requirement is not to be applied too strictly, finds that Dr. Tinari's failure to evaluate all available options neither renders his methodology unreliable nor his report inadmissible but, rather, goes to the weight of his testimony. As such, the Court, particularly cognizant of Dr. Tinari's extensive economic background and experience in valuing wage and benefit provisions, is convinced that Dr. Tinari's failure to consider certain employment opportunities—that may have, admittedly, altered his ultimate outcome—is a shortcoming that, rather than justifying exclusion of the testimony, can best be addressed by GM's counsel during cross-examination. *Daubert, supra*, 113 S.Ct. at 2798 (noting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Indeed, federal courts have generally found that "the 'perceived flaws' in an expert's testimony often should be treated as 'matters properly to be tested in the crucible of the adversarial system,' not as

'the basis for truncating that process.'" *Walker v. Yellow Freight Sys., Inc.*, No. CIV.A.98–3565, 1999 WL 757022, at *8 (E.D.La. Sept.24, 1999) (*quoting United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir.1996) (per curiam)); *Cf. Taylor v. Danek Medical, Inc.*, No. CIV. A.95–7232, 1999 WL 310647, at *2 (E.D.Pa. May 10, 1999) (recognizing that the defendants' contention that the plaintiffs' medical expert failed to review all of the relevant medical records "goes to the weight of his testimony, rather than the admissibility."); *Kannankeril, supra*, 128 F.3d at 808 (stating that notwithstanding the testimony of plaintiff's medical expert (who concluded that defendants' product was the most likely cause of plaintiff's condition) that an alternate explanation may exist separately for each of the plaintiff's individual symptoms, the defendants' "exploration of the cause of each individual symptom goes not to the admissibility of the evidence but to its weight."); *Paoli, supra*, 35 F.3d at 744 (explaining that even if the judge believes "there are better grounds for some alternative conclusion," and the scientist's method contains certain flaws, the conclusion will be admitted if based on "good grounds.").

In addition, the Court is satisfied that Dr. Tinari's testimony will prove helpful to the trier of fact in understanding the evidence—i.e., the value of plaintiffs' various options at the time GM offered the SAAA—and in determining a fact in issue—i.e., whether GM announced that the Trenton plant would close, so as to induce plaintiffs to accept the SAAA in order to eliminate numerous employees and make sale of the plant more attractive. Because the evidence and relevant issues in this matter are somewhat complex and involved, expert testimony can only assist

---

7. Dr. Tinari's statements that perhaps "that is a possible line of inquiry" and "when I saw that as an option, I pretty quickly discarded it, so, I think it was my call, my judgment call at that point" strongly indicate that he did not give much, if any, thought to how excluding these options would affect his overall theory

and conclusions. *Tinari Deposition* at 61, 63. Dr. Tinari further admitted in his deposition testimony that had he calculated the value of these other options his conclusion that the SAAA was the most favorable option would have been different. *See id.* at 63.

the trier of fact as contemplated by Federal Rule of Evidence 702.

Finally, with respect to GM's argument that Dr. Tinari improperly failed to attribute any value to healthcare benefits in valuing the option of retiring after plant closing pursuant to an MSR, the Court is satisfied that Dr. Tinari rectified his failure to do so by recalculating—and submitting to GM as a supplement to his liability report—the valuations of three plaintiffs who would have been at least fifty-five years old (the minimum age of eligibility for an MSR pension) to include healthcare benefits for such analyses. Although this supplemental report was submitted approximately one month after the date set by this Court for plaintiffs' production of expert liability reports, the Court finds good cause for this late submission—i.e., to clarify an issue that was easily resolved—and finds no resulting prejudice to GM. Indeed, GM voices no actual prejudice.

### III. Dr. Tinari's Punitive Damages Report

■ The more problematic issue before the Court is that presented by Dr. Tinari's report on "the range of reasonable value of punitive damages in this matter." *Celauro Certification*, Exhibit "C" at 1–5. In assessing this "range," Dr. Tinari reviewed GM's annual report for 1998 as well other current financial information about GM obtained from internet websites. *See id.* at 1–2. Recognizing the diverse theories on awarding punitive damages, Dr. Tinari sets forth three alternative approaches for the jury to consider in rendering punitive damages against GM. *See id.* at 2–4. The first approach "is based on the estimated savings to the corporation of the action taken; the second is based on a percentage of the income before taxes; and the third is based on a concept related to days of pay of the General Motors Corporation." *Id.* at 2. With each approach, Dr. Tinari provides the rationale, applies GM's financial information, and calculates the corresponding punitive award.

In attempting to preclude Dr. Tinari's report or testimony on this topic, GM maintains that Dr. Tinari lacks any particular expertise in the area of punitive damages, specifically noting that his experience is limited to providing two or three reports on punitive damages in lawsuits. *See Defendant's Brief in Support of Motion* at 7–9. GM also points out that Dr. Tinari has neither lectured nor written articles on this particular issue, and while he stated in his deposition testimony that he has reviewed several articles by other economists on punitive damages, he could not specifically recall any such articles other than the one cited in his report. *See id.* at 9.

Plaintiffs counter that Dr. Tinari sufficiently expressed in his deposition testimony his expertise on the issue of the economic analysis of punitive damages. *See Plaintiffs' Brief in Opposition to Motion* at 7. Specifically, plaintiffs point to Dr. Tinari's testimony that he has knowledge about the differing views among economists in this context, as well as his testimony that he has addressed the issue of economic analysis of punitive damages in lectures he has given, although he has not lectured solely or directly on that issue. *See id.* at 7; *Celauro Certification*, Exhibit "D" at 112–13. Plaintiffs further maintain that Dr. Tinari is familiar with the economic literature on punitive damages, even though he was unable to recall specific articles and authors during his deposition. *See Plaintiffs' Brief in Opposition to Motion* at 8; *Celauro Certification*, Exhibit "D" at 113.

The Court finds that there are numerous problems associated with allowing expert testimony on the issue of punitive damages. Although, as explained above, Dr. Tinari is qualified as an economist to summarize GM's business plans and to value plaintiff's wages and benefits under various options, there is no indication that he is similarly qualified to testify as to three approaches to ascertaining punitive damages or as to the "range of reasonable value of punitive damages." Having read a number of articles on the goals and

theories of punitive damages does not an expert make, nor does having an extensive economics background.

In fact, the Court finds there are no credentials that could qualify an individual as a punitive damages expert, primarily because the area of assessing punitive damages, implicative of various societal policies and lacking any basis in economics, rests strictly within the province of the jury and, thus, does not necessitate the aid of expert testimony. *See Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 1047, 113 L.Ed.2d 1 (1991) (Scalia, J., concurring) ("it has been the traditional practice of American courts to leave punitive damages (where the evidence satisfies the legal requirements for imposing them) to the discretion of the jury...."). Indeed, courts have characterized the jury's assessment of punitive damages as "an almost unconstrained judgment or policy choice about the severity of the penalty to be imposed, given the jury's underlying factual determinations about the defendant's conduct." *Atlas Food Sys. and Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996). Under the guise of providing guidance to the jury, Dr. Tinari's report in effect thwarts the jury's broad discretion by suggesting three approaches to ascertaining punitive damages and by calculating actual ranges of awards under each approach.[8] The Court has no reason to believe Dr. Tinari, or any other expert for that matter, is more qualified than the average juror to make a straightforward determination whether to punish GM and if so, to what extent. This is particularly so in an area fraught with controversy as well as various competing and diverse theories from which the trier of fact may choose according to personal feeling, experience, or reaction to a particular case.

*See* Cass R. Sunstein et al., *Assessing Punitive Damages (With Notes on Cognition and Valuation in Law)*, 107 YALE L.J. 2071, 2075, 2135 (1998) ("[t]he awarding of punitive damages has become one of the most controversial and important uses of tort law, extending well beyond the common law to such statutory areas as environmental protection and employment discrimination" and recognizing that "[p]unitive damages ... are intended to reflect a normative judgment about the outrageousness of the defendant's conduct (together with a judgment about deterrence)."). Plaintiffs provide no reason as to why the trier of fact in this matter will be unable to determine an appropriate punitive award on its own without the aid of, or clarification provided by, expert testimony.

In any event, the Court is convinced under the present circumstances that the assessment of possible ranges of punitive damages is not a proper subject for an expert's report or testimony. In arriving at this conclusion, the Federal Rules of Evidence provide guidance and support. Of particular relevance, Federal Rule of Evidence 702 requires, among other things, that the expert testimony must in some way assist the trier of fact. Unlike his liability report, the punitive damages report would not assist the trier of fact in any particular way because the jury could quite simply review the same financial information relied upon by Dr. Tinari and determine for itself the possible ranges of damages. Moreover, arriving at an appropriate punitive award in the present matter does not require any scientific, technical, or specialized knowledge as contemplated by Federal Rule of Evidence 702.

Further, assuming the Court found Dr. Tinari to be qualified and permitted him to

---

**8.** In fact, Dr. Tinari's report tells the jury—rather than merely suggests—under which theory to assess punitive damages against GM: "In other words, punitive damages may be viewed as an amount substantial enough to have the defendant change its policies and practices." *Celauro Certification*, Exhibit "C" at 1. In addition, the report dictates that "[p]unitive damages, therefore, must be assessed against the whole corporation so that management will act to ensure that its divisions carry out proper and legal policies." *Ibid.*

testify as an expert on punitive damages, such testimony, if found relevant, is nonetheless excludable under Federal Rule of Evidence 403 on grounds that its probative value is substantially outweighed by the danger of confusion of the issues or misleading the jury. Certainly, such testimony carries the risk of swaying and misleading the jury into the erroneous belief that it is limited to one of the three methods and ranges of damages outlined by Dr. Tinari. Another strong possibility is that expert testimony on punitive damages might confuse the issues to the extent that the jury is instructed, on the one hand, that it may assess any amount of punitive damages it deems proper and it is then provided, on the other hand, with expert testimony specifically outlining three methods of calculating damages as well as corresponding ranges of awards. A juror might feel psychologically compelled to reconsider his/her intuitive reaction to a case and instead defer to the methods and calculations set forth by the expert with purportedly superior knowledge, finding him/herself torn and confused as to the correct method to apply and the amount of damages to award. It would further constitute a waste of time, as contemplated by Rule 403, to present expert testimony on punitive damages when the jury could evaluate the financial data for itself and render the award it deems appropriate based on such data.

The Court is also persuaded by the language of the federal jury instructions on punitive damages:

> Whether or not to make any award of punitive and exemplary damages, in addition to actual damages, is a matter exclusively within the province of the jury, if you unanimously find, from a preponderance of the evidence in the case, that the defendant's act or omission, which proximately caused actual damage to the plaintiff, was maliciously or wantonly or oppressively done; but you should always bear in mind that such extraordinary damages may be allowed only if you should first unanimously award the plaintiff a verdict for actual or compensatory damages. And you should also bear in mind, not only the conditions under which, and the purposes for which, the law permits an award of punitive and exemplary damages to be made, but also the requirement of the law that the amount of such extraordinary damages, when awarded, must be fixed with calm discretion and sound reason, and must never be either awarded, or fixed in amount, because of any sympathy, or bias, or prejudice with respect to any party to the case.

[3 Hon. Edward J. Devitt, Federal Jury Practice and Instructions, Civil § 85.19 (4th ed.1987).]

Such language clearly reiterates the principle that awarding punitive damages rests exclusively within the discretion of the jury and, thus, lends support to the conclusion that expert testimony seeking to assist the jury by providing certain methods of calculating damages as well as actual ranges of damages invades the province of the jury and should be precluded.[9] As recognized by the United States Supreme Court, "Jury instructions typically leave the jury with wide discretion in choosing amounts [of punitive awards] . . . .," the procedural safeguard against which has generally been judicial review of the amount awarded. *Honda Motor Co. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 2340–41, 129 L.Ed.2d 336 (1994). The existence of such safeguards renders unnecessary the use of expert testimony as a means of ensuring that the jury's award reflects a reasonable amount of damages.[10]

9. Similarly instructive is New Jersey's Punitive Damages Act which, among other things, sets forth a number of factors to aid the trier of fact in assessing both whether punitive damages are to be awarded and if so, in what amount. N.J.Stat.Ann. § 2A:15–5.12 (West Supp.1999).

10. As a safeguard, judicial review of damages consists of determining whether the jury's award is so "grossly excessive as to shock the judicial conscience." *Murray v. Fairbanks Morse*, 610 F.2d 149, 152–53 (3d Cir.1979).

This Court's research has revealed no reported federal cases and only one state case addressing the propriety *vel non* of expert testimony on punitive damages. In *Farrall v. A.C. & S. Co., Inc.*, 558 A.2d 1078, 1080–81 (Del.Super.Ct.1989), the plaintiffs in an asbestos case attempted to present expert testimony "on the type of punitive damages award which would have a significant impact on defendants' operations 'in order to get the attention of the Board of Directors and stockholders,' and as to the profitability of the asbestos industry in general and the profitability of each defendant in particular on the issue of compensatory and punitive damages." In excluding such testimony, the Delaware court noted the state policy of prohibiting parties or their counsel from suggesting to the jury either an amount or a formula for determining an award for unliquidated damages. *Id.* at 1081–82. The court further recognized the state's restrictive approach to awarding punitive damages, reasoning that it "should not permit expansion of the area of testimony to accept expert testimony by suggesting the minimum amount of award which would be required to accomplish the objectives of punitive damages." *Id.* at 1082. In addition, the court explained that its experience with asbestos claim cases indicated that juries had endured no difficulty understanding the concept of punitive damages as explained by the court's instructions, pointing to two asbestos trials resulting in punitive awards of $75 million and $22 million. *Ibid.* Finally, the court found it significant that many similar claims had been filed throughout the country against essentially the same defendants, thereby finding that expert testimony on the quantum of damages required to effect a change in corporate policy "when presented in relation to this one case without recognition of the many other existing claims would provide

a strong distortion .... [of] the punitive damages considerations before the jury and ignore the defendants' potential liability to other claimants." *Id.* at 1083. Although the holding in this case is specific to Delaware's laws and polices, as well as to the particular facts of the case, it is nonetheless instructive to this Court's conclusion that the concept of punitive damages is not so perplexing or incomprehensible as to require the aid of expert testimony.

It should further be noted that following oral argument on September 7, 1999, the Court requested that counsel submit any reported cases where an expert was permitted to testify as to punitive damages; in response, plaintiffs' counsel submitted on September 13, 1999, one case from the Texas Court of Appeals, *Celotex Corp. v. Tate*, 797 S.W.2d 197 (Tex.App.1990). That case, however, is distinguishable from the present matter and is, in fact, detrimental to plaintiffs' position. In *Celotex Corp.*, the defendant appealed the trial court's decision to allow plaintiff's expert economist to testify regarding "the value of guidance, counsel, love, affection, intangibles, and the proper amount of punitive damages to award." *Id.* at 202. With respect to the expert's testimony on both the "intangibles" (love and affection) and punitives, the appellate court found that such testimony complied with the requisites of Rule 702[11] and was properly admitted. *See ibid.* That holding, however, was specifically premised on the fact that the expert merely "explained to the jury how to compute the present dollar value of these damages based upon hypothetical figures[ ]" and did not "assign a particular value to these damages elements." *Ibid.* Contrary to plaintiffs' contention, therefore, the Texas case is clearly inapposite to the present matter because the expert here applied actual figures (i.e., GM's cur-

---

11. Similar to Federal Rule of Evidence 702, the Texas version of the Rule provides that "[a] witness who, by his knowledge, skill, experience, training or education, has specialized knowledge that will assist the trier of fact in understanding the evidence or in determining a fact in issue may express an opinion about the matter." *Celotex Corp., supra*, 797 S.W.2d at 201.

rent financial information) in calculating, and suggesting to the trier of fact, three ranges of punitive damages. Furthermore, to the extent the *Celotex Corp.* case is read as supporting the admission of expert testimony on the theories or ranges of punitive awards, this Court disagrees with that conclusion and declines to follow the reasoning of the Texas state court.

Indeed, of particular relevance, the *Celotex Corp.* court also found that the expert's testimony on "guidance and counsel" damages, based on the average earnings of a teacher, was improperly admitted "because it indicated that the value of 'guidance and counsel' is commensurate to the hourly rate of a teacher." *Ibid.* As that court recognized that the expert there "possessed no special knowledge which the jurors did not possess in arriving at any specific values[,]" so this Court recognizes that Dr. Tinari similarly lacks any specialized knowledge that the jury in this case would not possess in assessing punitive damages. *Ibid.*

This Court's conclusion is further buttressed by the rationale of other courts, particularly state courts, with respect to other intangible and non-pecuniary forms of recovery under the law, otherwise known as general damages. For example, courts have recognized that there is no particular formula by which to assess damages for pain and suffering—although they have done so primarily in the context of determining whether counsel may set forth at closing argument mathematical formulas and calculations and thereby suggest a money value for pain and suffering, rather than in the context of expert testimony. In any event, their logic is helpful. *See, e.g., Beagle v. Vasold,* 65 Cal.2d 166, 53 Cal.Rptr. 129, 417 P.2d 673, 675 (1966) (recognizing that "[o]ne of the most difficult tasks imposed upon a jury in deciding a case involving personal injuries is to determine the amount of money the plaintiff is to be awarded as compensation for pain and suffering. No method is available to the jury by which it can objectively evaluate such damages, and no witness may express his subjective opinion on the matter."); *Angrand v. Key,* 657 So.2d 1146, 1149 (Fla.1995) (stating that "[t]echnical or mathematical calculations are impossible to make. The jury, guided by its judgment and everyday life experiences, is in the best position to make a fair assessment of these damages."); *DeHanes v. Rothman,* 158 N.J. 90, 97, 727 A.2d 8 (1999) ("the value of pain and suffering is simply beyond the reach of science"); *Botta v. Brunner,* 26 N.J. 82, 94–95, 138 A.2d 713 (1958) (explaining that "pain and suffering have no known dimensions, mathematical or financial. There is no exact correspondence between money and physical or mental injury or suffering, and the various factors involved are not capable of proof in dollars and cents. For this reason, the only standard for evaluation is such amount as reasonable persons estimate to be fair compensation[,]" entrusted to "the impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence."); Mark Geistfeld, *Placing a Price on Pain and Suffering: A Method for Helping Juries Determine Tort Damages for Nonmonetary Injuries,* 83 Calif.L.Rev. 773, 781 (1995) (recognizing that "[t]he difficulty created by pain-and-suffering damages is that there is no obvious way to translate an intangible, nonmonetary injury into a monetary award. Moreover, there is no objective test that measures the severity of the victim's pain-and-suffering injury. As a result, courts have tended to avoid the use of well-defined guidelines that can aid jurors in their determination of the award.").

Similarly, and particularly helpful to this Court's analysis, courts that have allowed recovery for hedonic damages—damages for loss of the enjoyment of life's pleasures, included in the concept of general damages—have generally precluded expert testimony on the subject, specifically finding that a lay person is fully able to understand and calculate hedonic damages and that it rests within the province of the jury to determine whether such damages should be awarded and if so, in what

amount. *See Pick v. American Med. Sys., Inc.*, No. CIV.A.94-1729, 1997 WL 149985, at *1 (E.D.La. March 25, 1997) (further barring expert testimony on hedonic damages on the grounds that it would not assist the trier of fact as contemplated by Federal Rule of Evidence 702 and because its probative value is substantially outweighed by the dangers of confusion of the issues or misleading the jury pursuant to Federal Rule of Evidence 403); *see also Saia v. Sears Roebuck and Co., Inc.*, 47 F.Supp.2d 141, 150 (D.Mass.1999) (holding that "the qualitative and quantitative value of the loss of [the plaintiff's] enjoyment of life ... can be calculated independently by the jury without the assistance, if not the confusion, of [the expert's] proffered testimony."); *Crespo v. City of Chicago*, No. 96 C 2787, 1997 WL 537343, at *3 (N.D.Ill. Aug.22, 1997) (opining that "the jury is able to decide for itself, without the assistance of an economics expert, the value that our society places on a human life.").

In yet other areas of the law, such as libel, intentional infliction of emotional distress, and sexual harassment, jurors are asked to make determinations—without an expert's assistance—as to monetary awards where there is no definite or clear guide to measuring damages. For example, in the law of libel, "which notoriously lacks clear measures of damages[,]" the trier of fact is asked to determine an amount of damages to compensate for general reputational harm that cannot be easily correlated with monetary measures. Sunstein et al., *supra*, *Assessing Punitive Damages (With Notes on Cognition and Valuation in Law)*, 107 YALE L.J. at 2133. "In this context, the jury is again likely to be mapping a complex judgment about the quality of the harm and perhaps the nature of the plaintiff and the defendant onto

an unbounded dollar scale." *Id.* at 2134. The jury is in a similar predicament in fashioning remedies for intentional infliction of emotional distress and sexual harassment; with respect to the latter, "How does a jury know what amount would provide an employee, or a student, with adequate compensation for quid pro quo or hostile environment harassment?" *Ibid.* This Court's research has revealed no reported cases in these contexts wherein courts have permitted experts to step into the exclusive province of the trier of fact by suggesting possible monetary awards.

Extending the rationale of the opinions in these other analogous areas leads to the logical conclusion that expert testimony on punitive damages is neither desirable nor necessary, and indeed, would invade the sacrosanct role of the jury. The Court is satisfied that the trier of fact in the present matter is the proper, and only, quantifier of punitive damages; in essence, there is no science or methodology [12] to awarding such damages where the jury can evaluate for itself GM's financial records and determine how to punish accordingly. As such, this Court will grant GM's motion to the extent it seeks to preclude Dr. Tinari's report and testimony on punitive damages.

### III. *Conclusion*

In sum, the Court finds that Dr. Tinari is qualified to render an expert opinion on liability and that his liability reports survive *Daubert*'s reliability requirements. The Court reiterates that any flaws in the reports go to their weight rather than their admissibility. As such, GM's motion to preclude Dr. Tinari's liability report as well as the supplement to that report is denied. However, GM's motion to pre-

---

12. Even were this Court to find Dr. Tinari qualified to testify as to punitive damages and the issue of punitive damages to be a proper subject for expert testimony, Dr. Tinari's report would not survive the *Daubert* reliability analysis. For example, there exists no basic agreement among economists as to the proper method by which to assess punitive damages; there is no indication that the three methods chosen by Dr. Tinari are generally accepted; and there is a lack of unanimity on the particular methods chosen by Dr. Tinari. As such, even if the proposed expert's testimony survived a qualifications analysis, it would fail under a *Daubert* analysis.

clude Dr. Tinari's report and testimony on punitive damages is granted because the Court finds this is not proper testimony.