**John CROWLEY, as Receiver
of Ambassador Insurance
Company, Plaintiff,**

v.

**Doris June CHAIT, et al., Defendants.**

**Civ. No. 85–2441 (HAA).**

United States District Court,
D. New Jersey.

March 16, 2004.

Richard B. Whitney, Fordham E. Huffman, of Jones Day, Cleveland, OH, Robert J. Stickles, Carpenter, Bennett & Morrissey, Robert J. Stickles, Christopher J. Dalton, Michael T. Stewart, Klett, Rooney, Lieber & Schorling, PC, Newark, NJ, for Plaintiffs.

Jay Kelly Wright, Arnold & Porter, LLP, Washington, DC, Robert E. Bartkus, Dillon, Bitar & Luther, L.L.C., Morristown, NJ, Arthur R. Schmauder, Drinker, Biddle & Shanley, LLP, Stephen R. Long Michael Charles Zogby, Drinker, Biddle, & Reath LLP, Florham Park, NJ, for Defendants.

### OPINION AND ORDER

ACKERMAN, Senior District Judge.

This matter comes before the Court on eight separate motions. Six of these motions are brought by Defendant PricewaterhouseCoopers LLP ("PwC") to exclude the testimony of Plaintiff John Crowley's ("Plaintiff") expert witnesses, almost exclusively on the grounds that the testimony of these experts fails to meet the standards prescribed by the United States Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In these motions, PwC seeks to exclude: (1) the testimony of Joseph Walsh and Charles McAlear; (2) the testimony of James F. Cerone; (3) the testimony of Paul L. Sweeney;[1] (4) the testimony of Loren Kramer; (5) the testimony of Dale Ogden and Susan Szkoda; and (6) certain rebuttal testimony of witnesses Szkoda and Kramer. Defendant Ambassador Group moves to join PwC in these motions. Finally, Plaintiff Crowley

John M. Boyle, Special Master, Westfield, NJ, pro se.

---

1. PwC seeks to exclude Sweeney's testimony not on *Daubert* grounds but on the grounds that it violates Fed.R.Civ.P. 26(a)(2)(B).

seeks to exclude the testimony of PwC's experts R. Larry Johnson and Daniel R. Fischel, also on *Daubert* grounds.

For the following reasons, PwC's motions to exclude: (1) the testimony of Joseph Walsh and Charles McAlear is DENIED; (2) the testimony of James F. Cerone is GRANTED IN PART AND DENIED IN PART; (3) the testimony of Paul L. Sweeney is DENIED; (4) the testimony of Loren Kramer is GRANTED IN PART AND DENIED IN PART; (5) the testimony of Dale Ogden and Susan Szkoda is DENIED; and (6) the rebuttal testimony of witnesses Szkoda and Kramer is GRANTED IN PART AND DENIED IN PART. Plaintiff Crowley's motion to exclude PwC's experts R. Larry Johnson and Daniel R. Fischel is GRANTED IN PART AND DENIED IN PART.

## I. BACKGROUND

This case is almost nineteen years old and with a little luck it will not see the age of twenty. It arises from the 1984 insolvency and liquidation of Ambassador Insurance Company, a Vermont-incorporated insurer with its principal place of business in New Jersey. Ambassador wrote insurance in the so-called "surplus lines" market, which offers insurance for high or novel risks for those unable to obtain insurance from the traditional, "admitted" marketplace. Coopers & Lybrand ("C & L"), now PricewaterhouseCoopers ("PwC"), audited the consolidated financial statements covering the years 1979–1982

of Ambassador's parent company, Ambassador Group, Inc., a public company. Senior management of Ambassador are among the defendants. As a Vermont-domiciled entity, Ambassador was under the primary regulatory jurisdiction of the Plaintiff, the Commissioner of Banking and Insurance for the State of Vermont. After a sharp decline in Ambassador's surplus (the excess of its assets over its liabilities), the Plaintiff ordered a one-week review by outside consultants and ordered Ambassador to take certain actions. In November 1983, upon the further deterioration of Ambassador's financial position, the Plaintiff filed suit in Vermont state court to have himself appointed Receiver of the company.[2] The Commissioner ultimately moved for authority to liquidate the company upon discovering that Ambassador was insolvent.

This lawsuit has been filed against the estate of Ambassador's CEO Arnold Chait and PwC, whose predecessor C & L served as auditor of Ambassador's parent company. Plaintiff's theory of the case is that Chait grossly mismanaged the company, ultimately bankrupted it and continued writing policies well after the company collapsed. The Complaint charges the management defendants with mismanagement, breach of fiduciary duty, and fraud. It charges PwC with negligence in connection with audits of Ambassador Group's financial statements for the years 1981 and 1982. The Complaint alleges that Defendants are responsible for the entire

---

**2.** On account of the lengthy duration of this case, several different people have served as the Commissioner of Banking and Insurance for the State of Vermont, the Receiver of Ambassador Insurance Company, and the named Plaintiff. These three roles have been played by one person at a time, and have overlapped almost entirely for purposes of this case. There have been times, though, when these three roles have not overlapped,

*e.g.* prior to the time the Commissioner acted to be appointed Receiver. The Court feels that whatever benefit in terms of precision might be obtained by continuous parsing of this distinction throughout the opinion would be substantially outweighed by the unnecessary confusion it would cause. For the sake of simplicity, then, the Court will refer to all of these individuals and entities as "Plaintiff".

amount of the insolvency, last estimated to be approximately $85 million.

## II. Legal Analysis

Since the majority of the motions before the Court implicate the admissibility standard for expert witnesses under Fed. R.Evid. 702 as elucidated by the Supreme Court in *Daubert*, the Court begins its legal analysis with a discussion of that case and its progeny. This legal analysis applies to all of the motions subsequently discussed in this opinion, except for the motion to exclude the testimony of Paul L. Sweeney, because *Daubert* is not implicated in that motion. The legal standard applicable to that motion will be discussed below in the relevant section of this opinion.

### A. The Daubert Standard

Federal Rule of Evidence 702 provides that where

scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. "Rule 702 imposes three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir.2000). In *Daubert*, the Supreme Court instructed that an "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation;' the expert must have

'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir.1994) (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786). *Daubert* requires courts to perform a "screening function" to ensure the relevance and reliability of expert testimony, and in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court extended this gatekeeping obligation from scientific evidence to encompass all expert testimony.

■ The Supreme Court in *Daubert* and the Third Circuit in *Paoli* announced factors for courts to consider in determining whether to admit expert testimony. These factors include:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Paoli*, 35 F.3d at 742 n. 8. This list is "nonexclusive" and "each factor need not be applied in every case." *Elcock*, 233 F.3d at 746. Rather, the court must tailor its inquiry to the facts of each case and "should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of the expert testimony." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167; *see also id.* at 150, 119 S.Ct. 1167 (noting that the *Daubert* factors may or may not be useful depending on the "nature of the issue, the expert's particular expertise, and the subject of his testimony") (citation omitted). The propo-

nent of expert testimony must establish the admissibility of the expert's opinion by a preponderance of the evidence. *Paoli*, 35 F.3d at 744.

In considering the reliability of an expert's testimony, the court's inquiry must be based "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. As the Supreme Court has recognized, "conclusions and methodology are not entirely distinct from one another." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The Supreme Court has emphasized that

> nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.*

However, an expert's testimony need not be flawless for it to be reliable and admissible. As the Third Circuit has recognized,

> [t]he grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.

*Paoli*, 35 F.3d at 744. Furthermore, the court's role as a gatekeeper "is not intended to serve as a replacement for the adversary system." Fed.R.Evid. 702, advisory committee's note. As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

As the Supreme Court has noted, *Daubert's* general holding applies not only to scientific knowledge but to technical and other specialized knowledge as well. *Kumho Tire*, 526 U.S. at 137, 119 S.Ct. 1167. The Daubert factors may not necessarily or exclusively apply to all experts in every given case. *Id.* As has been asserted, "the *Daubert* factors do not always fit neatly into or easily translate in the context of nonscientific testimony." *Voilas v. General Motors Corp.*, 73 F.Supp.2d 452, 461 (D.N.J.1999). Indeed, the inquiry into an expert's reliability may focus instead upon personal knowledge or experience. *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167; *see also Voilas*, 73 F.Supp.2d at 461 (observing that, in this nonscientific context, "the qualifications of the expert will be of particular importance. This is so because in the nonscientific world, theories are often not subject to testing or experimentation. Although the focus of the inquiry must still be on verification of the expert's methodology, the inquiry is more difficult because much nonscientific expert testimony is based on the experience of the expert, instead of the experimentation.") (quoting Timothy Perrin, *Expert Witness Testimony: Back to the Future*, 29 U. Rich. L.Rev. 1389, 1457 (1995)).

### B. Daubert Hearing

The Third Circuit has established a process by which a court is to handle *Daubert* motions. At the outset, the Court must determine, pursuant to Federal Rule of Evidence 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.

*Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. The Third Circuit has long stressed the importance of holding *in limine* hearings to make this reliability determination required by *Daubert. Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412, 417 (3d Cir. 1999). The concern in holding such a hearing is that the court should have access to a detailed factual record at the evidentiary stage. *Hines v. Consolidated Rail Corp.,* 926 F.2d 262, 272 (3d Cir.1991). It is particularly important that the party defending the admissibility of evidence be given adequate chance to do so. *Paoli,* 35 F.3d at 739. The proponent bears the burden of establishing admissibility by a preponderance of the evidence. *Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786.

Still, an *in limine* hearing is not required in all cases in which a *Daubert* objection is raised to a proffer of expert evidence. *Padillas,* 186 F.3d at 418. Ultimately, the decision whether or not to hold a hearing rests within the sound discretion of the district court. *Id.* Where the ruling on admissibility turns on factual issues in the summary judgment context, failure to hold a hearing may be an abuse of discretion.

Turning to the case before the Court, two observations must be made. First, these motions have not been filed in the summary judgment context. Second, the Third Circuit's concern that the Court be furnished with an adequate factual record upon which to base its conclusions has been met and, in the Court's view, exceeded far past the point of any legitimate concern. Each and every motion has been extensively briefed by both sides. Each of these briefs has been accompanied by mammoth appendices, including expert reports, expert depositions, fact witness depositions, charts and graphs of every type and variety, insurance industry articles, unpublished opinions, and more. The sum total of both parties' submissions runs to several thousand pages.

In *Voilas,* the court rendered its *Daubert* decision without availing itself of an *in limine* hearing. 73 F.Supp.2d at 455. Observing that, unlike in *Padillas,* the expert in *Voilas* had been given the opportunity to explain and even correct certain deficiencies, the *Voilas* court found that it had a sufficient factual record upon which to base its conclusions. For similar reasons, this Court will rule on the *Daubert* motions before it without holding an *in limine* hearing.

### C. The Experts

#### (1) Walsh and McAlear

█ Joseph M. Walsh and Charles A. McAlear reviewed Ambassador's underwriting (i.e. the decision regarding what business to take and at what price). Specifically, Walsh and McAlear were given the responsibility of determining whether or not there was enough information in Ambassador's files to underwrite at all, and to a lesser extent, whether Ambassador utilized the extant information in a way that would comply with the business norms of underwriting in the surplus lines insurance market. PwC challenges Walsh and McAlear's testimony on *Daubert* grounds, arguing both that these experts are unqualified and that the methodology they employed was unsound.

##### a. Qualifications

Both Walsh and McAlear have worked in the insurance industry for more than forty years. McAlear began as an underwriter with The Travelers Insurance Company from 1957 until 1964 and moved to Employers Reinsurance Corporation ("Employers Re") from 1965 to 1967. At Employers Re, McAlear underwrote surplus lines risks, the same types of risks underwritten by Ambassador. He also

worked for a surplus lines broker for a year, and went on to manage two different managing general agencies ("MGAs"), where he supervised underwriters of surplus lines policies for various surplus lines companies. In 1970, McAlear opened his own surplus lines brokerage firm and he was licensed as an MGA around 1975. He founded his own insurance company in 1972, which he eventually sold, along with McAlear Associates, to Harleysville Insurance Company. He continued working at McAlear Associates until about 1987.

McAlear was also the founder of the National Association of Professional Surplus Lines Offices ("NAPSLO"), a national trade association representing the surplus lines industry and the wholesale insurance system. NAPSLO incorporated in 1975 and McAlear served as its first president until 1977. NAPSLO gave McAlear its highest award and named the award after him in the early 1980s. He is a Chartered Property Casualty Underwriter, and has received numerous awards, including the Surplus Lines Person of the Year in New Jersey and the Man of the Year from the Michigan Mutual Agents Association. In 1994, McAlear was elected as a Charter Member of the Michigan Insurance Hall of Fame.

Joseph Walsh worked at SAFECO Insurance Company for 20 years, where he held various underwriting and underwriting management positions. In 1975, he left SAFECO to become Chief Underwriting Officer for American Empire Insurance Company, where he had 50 underwriters reporting to him. The company was subsequently purchased by Great American Insurance Company, which promoted Walsh to Vice President of Field Services and charged him with examining underwriting at 18 division offices and 35 branch offices. He traveled around the country for two and a half years reviewing underwriting files and assessing the quality of Great American's underwriters. Walsh was promoted to become the Commercial Lines Property Officer, then to Vice President responsible for the marketing team and all agents representing the company, and then to Vice President of the Cincinnati regional office.

In 1981, Walsh became President of the Great American Surplus Lines Insurance Company, a wholly owned subsidiary now named the American Empire Surplus Lines Insurance Company ("AESLIC"). Walsh served as President of AESLIC for ten years and then as Chairman until 1998. At the peak of operations, he ran a company of 119 employees and was involved in surplus lines underwriting.

PwC asserts that Walsh and McAlear lack the appropriate qualifications to testify because "neither was ever employed as an underwriter by a company like Ambassador." (PwC First Mot. to Exclude at 27). PwC asserts that as an MGA, McAlear did not engage in actual underwriting, and that although Walsh was in fact an underwriter, he did not train or work as an underwriter in the excess and surplus sector. (*Id.*) An expert may indeed be excluded when his training and experience is lacking in the particular area in which his testimony is offered. *Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1055 (3d Cir.1997) (affirming exclusion of electrical and mechanical engineering expert because he had no training in "habituation" and no experience in designing equipment from a human safety standpoint.) However, the Third Circuit has stressed that the qualifications requirement is to be construed "liberally." *Elcock*, 233 F.3d at 741. In *Holbrook v. Lykes Bros. Steamship Co., Inc.*, 80 F.3d 777 (3d Cir.1996), the Third Circuit reversed the district court's exclusion of plaintiff's treating physician's diagnosis of mesothelioma. The district court

had excluded the testimony on the grounds that the physician was not an "oncologist or a specialist in ... 'definitive cancer diagnosis.'" *Id.* at 781. The Third Circuit held that the district court had construed the qualifications requirement too narrowly, reasoning that the issue was ripe for exploration on cross-examination, but not for *Daubert* exclusion.

Both Walsh and McAlear have extensive experience in underwriting and the surplus lines insurance industry. It is not even necessary to construe the *Daubert* qualifications requirement liberally to admit their testimony. Their vast experience in the insurance industry and with the issues that form the core of this litigation readily qualifies them to opine on Ambassador's underwriting practices.

b. Methodology

PwC further argues that the testimony of both Walsh and McAlear should be excluded on *Daubert* grounds because of the methodology they employed in surveying the Ambassador files. Of particular concern, PwC argues, is Walsh and McAlear's application of shifting and arguably subjective standards that were not only inconsistent as between Walsh and McAlear, but inconsistently applied by each individual. Walsh and McAlear were faced with the task of determining, among other things, whether and how much actual underwriting had taken place at Ambassador between the years 1981–82. There is no dispute that a determination as to how much underwriting had in fact taken place is relevant to Plaintiff's theory that in Chait's efforts to rapidly expand the company, he took unjustifiable business risks that Defendants negligently failed to recognize in their audits of the company.

■ As a preliminary matter, it is worth observing that the type of testimony involved in this case is more closely akin to that of technical knowledge as discussed in *Kumho Tire* than to traditional scientific knowledge. In such cases of nonscientific testimony, the emphasis is placed not on the methodology of the expert testimony, but on the professional and personal experience of the witness. *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167; *see also Proto-Comm Corp. v. Novell Advanced Servs., Inc.,* 171 F.Supp.2d 473, 477 (E.D.Pa.2001). The methodology of proffered nonscientific testimony need not be subjected to rigorous testing for scientific foundation or peer review. *Smithkline Beecham Corp. v. Eastern Applicators, Inc.,* No. 99–CV–6552, 2001 WL 1526273 at *3, 2001 U.S. Dist. LEXIS 19728 at *9 (E.D.Pa. Nov.29, 2001). In *Smithkline,* the plaintiffs charged the defendants with bid rigging on a roofing project. Plaintiffs proffered two experienced commercial roofers as experts for the purpose of calculating a normal, competitive roofing bid. Instead of subjecting the experts' methodology to rigorous scientific standards, the *Smithkline* court, acknowledging the nonscientific nature of the inquiry, admitted the expert testimony after concluding that the methodology employed was rooted in the experts' practical experience. *Id.* at *3–4, 2001 U.S. Dist. LEXIS 19728 at *9–10.

It is true that in *Smithkline,* the experts were hired only to testify about one roofing job, not hundreds of underwriting files. Nevertheless, PwC has made no argument that Walsh and McAlear are unqualified to extrapolate their conclusions to Ambassador as a whole, nor has PwC argued that the sample of files reviewed by Walsh and McAlear lacks statistical significance. Instead, PwC dissects virtually every step in the process used by Walsh and McAlear to track their own understanding of what was going on in each of the files they reviewed.

For example, Walsh and McAlear used worksheets to track the accumulation of

data from the files. PwC expresses particular concern about the use of the worksheets. PwC points out that in answer to one question on the worksheet ("was there an application in the file?") Walsh and McAlear applied a different standard:

McAlear did not credit a file with an application unless the application was completed with all of the requested substantive information provided. Although Mr. Walsh noted that many applications were incomplete, and therefore of lesser underwriting value, he took a more liberal view and credited a file as containing an application irrespective of whether the application was fully completed.

(Pl. Supp. Resp. at 8). Additionally, in what PwC characterizes as the "biggest revelation" about Walsh and McAlear's methodology, PwC claims that Walsh and McAlear revised most of their worksheets and changed the answers. In presenting this argument, PwC seeks to employ a somewhat creative application of the third prong of the *Daubert* test, "the known or potential rate of error." Third Circuit caselaw does not contain any specific discussion of this prong, although on its face the phrase is reminiscent of discussions of error in statistical sampling and other quantitative modes of analysis, such as the rate of error in an epidemiological survey. PwC asserts that the work of both Walsh and McAlear had an "extremely high error *correction* rate." (PwC.'s First Mot. to Exclude at 13) (emphasis added). PwC asserts that this error correction rate was 80 percent for Walsh and 70 percent for McAlear and "is itself a sufficient basis for excluding their opinions." (*Id.*) When PwC confronted Plaintiff, asking that Walsh and McAlear substantiate certain statements by reference to specific files, the experts "retracted those statements" according to PwC. (*Id.*)

■ In fact, if any error still needs correction, it is in PwC's line of reasoning. The problem with PwC's argument is contained in its own terminology, by its own telling use of the phrase "error *correction* rate." (*Id.*) (emphasis added). *Daubert* does not require that an expert's testimony be excluded simply because he admitted and corrected his own mistakes or retracted his false statements. In fact, one of the very purposes of a *Daubert* hearing, discussed above, is to give experts a chance to explain and even correct errors that they made in their reports. In *Voilas,* for example, the court declined to hold an *in limine* hearing precisely because the expert in question had the opportunity to "explain, and even correct, certain deficiencies [the *Daubert* movants] brought to his attention." *Id.* at 455. There is no stigma attached to such error correction, nor should there be. If anything, it strengthens the quality of the expert report. The known or potential rate of error discussed in the third prong of *Daubert* more likely refers to the rate at which unknowable mistakes that cannot be corrected have been made in a data or statistical set; the known or potential rate of error then serves as an indication of how reliable or unreliable that data may be.

■ PwC also criticizes Walsh and McAlear for their allegedly inconsistent application of methodology. This criticism also fails. There may well be some rational disagreement about when a file contains enough information for sound underwriting to begin. Among the many tasks in this case that will face a jury of lay people with no experience in the field of underwriting will be the challenge of reaching some conclusion about this issue. The use of the testimony of experts in the field who have themselves spent much of their careers engaged in the business of underwriting appears to be a rational approach. For a

case of this magnitude, it seems eminently reasonable to ask two highly experienced, well-credentialed, accomplished insurance professionals with underwriting experience to examine a sample of files and provide their expert opinion to a factfinder. Certainly the use of inconsistent approaches as between Walsh and McAlear may raise questions about the reliability of the findings of one or both of them, but it does not in and of itself show that the methodology they employed was so inherently flawed as to render their respective testimonies inadmissible. *Kumho Tire,* 526 U.S. at 153, 119 S.Ct. 1167 (experts may reasonably differ without necessitating *Daubert* exclusion.)

Likewise, the fact that Walsh and McAlear revised most of their worksheets may also damage the credibility of their findings, although the revision of the worksheets may well reflect the conscientiousness of their efforts. The mere fact of self-correction alone, however, does not demonstrate the use of a methodology so flawed as to render the testimony inadmissible. In both cases, the questions raised goes to the weight and credibility of the testimony, not to its admissibility. *See, e.g., Daubert,* 509 U.S. at 596, 113 S.Ct. 2786 ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Voilas,* 73 F.Supp.2d at 462 ("Indeed, federal courts have generally found that the perceived flaws in an expert's testimony often should be treated as matters properly to be tested in the crucible of the adversarial system, not as the basis for truncating that process.")

Accordingly, Defendants' motion to exclude the testimony of Walsh and McAlear on *Daubert* grounds is DENIED.

(2) James F. Cerone

Cerone is highly qualified and PwC does not seriously contest his qualifications. He was an executive vice president at the Travelers Insurance Company who oversaw 8,400 claims personnel including the general counsel, the staff counsel, special investigative units, and claims training personnel, all of whom reported to him. He has amassed a vast amount of claims handling and reserve setting experience, and has lectured extensively on the subject. He is currently a consultant.

▉ PwC does challenge the methodology Cerone employed in reaching his conclusions. Cerone tested a sample of 1,348 files from the total number of files open on June 30, 1983. (PwC's Second Motion to Exclude at 6). According to PwC's own brief, Cerone constructed the sample by first separating the 7,775 total open files based on their reserve amounts as of June 30, 1983. (*Id.*) He separated the files into groups based on reserve values of $1–499; $500; $501–1,499; $1,500; $1,501–44,999; $45,000–50,000; and $50,001 and over. (*Id.*) Cerone then selected files within each group for review by using specified intervals (e.g. picking the first listed file and every tenth file thereafter for the files with reserve amounts of $500) until he had a certain percentage of files from each group. Cerone, according to PwC, ensured that the sample size for each group constituted at least ten percent of the total number of files in the group; this method, Cerone reasoned, rendered the sample sizes "credible." (*Id.*) PwC's complaint is that Cerone "did not use a reported or published methodology to determine the appropriate sample size; he instead relied solely on his judgment." (*Id.*)

The Court rejects PwC's contentions that this methodology was unsound simply because it relied upon no reported or published methodology. Given Cerone's ex-

tensive experience in the field of underwriting, his assertion that he and his staff applied industry standards suffices. "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed.R.Evid. 702, advisory committee note (2000). Cerone's standards were those he learned as a claims examiner at various insurance companies and that he expected the 8,400 claims personnel at the Travelers to use when he supervised them. (Cerone 6/19/01 Dep. at 44.) Nowhere does PwC suggest that the standards utilized by Cerone were not in fact the industry's standards.

■ PwC also asserts that Cerone merely relied upon information spoonfed to him by plaintiff's counsel. Specifically, PwC objects that Cerone was only given the testimony of claims personnel provided to him by counsel. Indeed, Plaintiff states that the purpose of Cerone's report was to "test the testimony of the former claims supervisors." (Pl. Mem. in Opp. at 22). This phrase is not a model of clarity. The Court's understanding of Cerone's mission is that he conducted an independent analysis of Ambassador's claims for the purpose of seeing whether his own understanding matched those of Plaintiff's witnesses.

In rejoinder, PwC raises valid questions: if other claims personnel offered a contradicting view of Ambassador's claims, why didn't Cerone test their testimony as well? Why was their testimony not included in the material for Cerone to review? Moreover, there is something dubious about hiring an expert to "test testimony." Lawyers test testimony. Experts should conduct independent analyses, which ultimately may or may not confirm what various deponents have said. The information upon which an expert bases his testimony

must be reliable, and the selective furnishing of information by counsel to an expert runs afoul of Fed.R.Evid. 703, which, in addition to Rule 702, must be considered by a court for *Daubert* purposes. *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999).[3] Even at this late date, the Court has still not been furnished with a clear picture of how much of Cerone's report is based on the witness testimony provided to him, and how much of it is based on his own independent analysis of Ambassador's claims files. Any parts of that report which rely on the preselected deposition testimony of the claims managers is barred. *See infra* at section II.C.4. To the extent that the report is based on his own independent investigation of Ambassador's claims files, relying upon information he gleaned for himself from the files, it will be admitted.

■ PwC further argues that Cerone's testimony fails to meet the *Daubert* "fit" requirement, namely, that the testimony must in fact assist the jury by providing it with relevant information necessary to a reasoned decision of the case. *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 595 (D.N.J.2002). Since this lawsuit accuses PwC of negligently auditing Ambassador's books from 1981 to 1982, PwC argues that the status of claims open as of June 30, *1983* is irrelevant to the determination as to whether C & L acted inappropriately. The Court agrees. Plaintiff failed to offer a satisfactory explanation of the relevance of Cerone's report given that much of it assesses the state of Ambassador's claims files as of June 30, 1983, a date outside the scope of the accusations against PwC. Accordingly, insofar as it pertains to PwC's auditing efforts, Cerone may not testify in reliance upon those aspects of his report which assess the state of the claims files as

---

**3.** This issue is discussed extensively in section II.C.4 below.

of June 30, 1983, nor will his evidence regarding those claims files after December 31, 1982 be used in the case against PwC.[4] Cerone will be permitted to testify against PwC about his conclusions based on data as of December 31, 1982 (*e.g.* Cerone Report, Tables 1–3).

Finally, PwC makes numerous other arguments regarding Cerone's testimony. After carefully reviewing PwC's submissions, the Court concludes that all of PwC's other arguments relate more to the weight than the admissibility of the testimony. PwC may properly air them on cross-examination.

Accordingly, Defendant PwC's Second Motion to Exclude the Testimony of Plaintiff's Retained Expert James F. Cerone is GRANTED IN PART AND DENIED IN PART. Cerone's testimony regarding information that postdates December 31, 1982 may not be used as evidence against Defendant PwC, although his report in its entirety may be used against the remaining defendants. To the extent Cerone's report relies on selected deposition testimony given to him by Plaintiff's attorney, it is barred, and to the extent it relies upon his own independent analysis of Ambassador's claims files, it is admitted.

### (3) Paul Sweeney

 The motion to exclude Paul Sweeney's testimony does not implicate *Daubert*. Instead, PwC argues that Sweeney's testimony should be excluded on the grounds that it violates the requirement in Fed.R.Civ.P. 26(a)(2)(B) that an expert's testimony "be accompanied by a written report prepared and signed by the witness."[5] PwC asserts that the report was signed by Sweeney, but that it was in fact

prepared by Fordham Huffman, Plaintiff's attorney.

The Advisory Committee Note for Rule 26(a)(2)(B) recognizes that counsel's assistance in the preparation of expert reports will be necessary at times:

> Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports, and indeed ... assistance may be needed. Nevertheless, the report, which is intended to set forth the substance of the direct examination, should be written in a manner that reflects the testimony to be given by the witness and it must be signed by the witness.

Still, "preparation implies involvement other than perusing a report drafted by someone else and signing one's name at the bottom to signify agreement.... Allowing an expert to sign a report drafted entirely by counsel without prior substantive input from an expert would read the word 'prepared' completely out of the rule." *Manning v. Crockett*, No. 95–C3117, 1999 WL 342715, at *3 (N.D.Ill. May 18, 1999). Courts have excluded the testimony of experts when they have reached the conclusion that these reports failed the Rule 26(a)(2)(B) preparation requirement. In *Stein v. Foamex Int'l, Inc.*, No. CIV.A.00–2356, 2001 WL 936566 (E.D.Pa. Aug.15, 2001), the court excluded an affidavit submitted to supplement an expert's opinion. *Id.* at *5. At a hearing, the *Stein* expert made no claim to have played any substantial role in the preparation of the affidavit which he admitted was in fact prepared by counsel. *Id.* Similarly, in *In re Jackson National Life Insurance Company Premium Litigation*, No. 96–MD–11222, 2000

---

**4.** Plaintiff may, of course, use the Cerone report including the data up to June 30.1983 against Ambassador and the management defendants.

**5.** PwC does not dispute that Sweeney is a qualified witness.

WL 33654070 (W.D.Mich. Feb.8, 2000), the district court affirmed a magistrate judge's exclusion of an expert's report and testimony because the evidence demonstrated that "counsel's participation so far exceeded the bounds of legitimate 'assistance' as to negate the possibility that [the expert] actually prepared his own report within the meaning of Rule 26(a)(2)." *Id.* at *1–2. In reaching this decision, the *Jackson* court observed that there were "undeniable substantial similarities" between the expert's report and the report of another expert prepared with assistance from the same counsel in an unrelated case. *Id.* Furthermore, the *Jackson* court concurred with the conclusion of the magistrate that the expert had testified untruthfully. *Id.*

In large part, PwC's motion to exclude is based upon the following statement made by Plaintiff's counsel Huffman during Sweeney's deposition:

> The initial draft of this report was prepared on our system based upon a narrative drafted by me following essentially a dictation interview with Paul [Sweeney]. You know, without testifying, essentially the way this worked was given Paul's duties and schedule at [John] Hancock [the insurance company], and the timing of the requirement for the production of the reports, he was not in a position to do a—to sit down and write a report. So he agreed *to go forward with us as an expert and* review documents; and I probably made three trips to Boston to meet with him to sit with him as he went through the documents and discussed them with them, and then to take down his—essentially the opinions and rationale that he would give me, but organize it into a narrative. So, one of the documents that you have and it is probably the one that has the most extensive markings on his—of his, was, in fact, a first draft that was put together by me as a result

of the interview and the dictation that he gave me. But the—I mean, it was prepared on our system; and in terms of putting the words down on paper in the order in which they appear, that was mine.

(Sweeney 05/07/02 Dep. 87–88).

The fact patterns in both *Stein* and *Jackson* are distinct from the facts before the Court. Here, Sweeney claims to have offered substantial input into what was put into the report. (Sweeney 05/07/02 Dep. at 18). Huffman's statement, quoted above, reflects that fact. Moreover, there is no reason to question Sweeney's veracity. Although PwC does not challenge Sweeney's qualifications, it is worth noting them here in abbreviated form. Though currently retired, Sweeney was the President and Chief Operating Officer of John Hancock Property & Casualty Holding Company and John Hancock Management Company, and he was Senior Vice President with John Hancock Financial Services and John Hancock Life Insurance Company. (Sweeney 05/07/02 Dep. at 31, Ex. 2). He is not being compensated for the time he spends on this matter, having undertaken it on a *pro bono* basis pursuant to Hancock's policy of cooperating with regulators such as Plaintiff when asked. (Pl.'s Opp. to PwC's Third Mot. to Exclude at 3 n. 3). Moreover, he is familiar with Ambassador's financial condition given that in 1983 he was part of a team of consultants hired by the Vermont Commissioner of Insurance to examine C & L's papers from its 1982 audit. (*Id.*) Sweeney has stated: "This is my report. These are my opinions ..." (Sweeney 05/07/02 Dep. at 18). The Court has no reason to disbelieve him at this time.

Moreover, while the type of assistance rendered by Mr. Huffman in the compilation of this report may approach the limits

of what Rule 26(a)(2)(B) will allow, it does not run afoul of those limits. The issues raised here are of a type with those raised in other cases where courts declined to exclude an expert's report on the basis of a Rule 26(a)(2)(B) challenge. In *Isom v. Howmedica, Inc.*, No. 00–5872, 2002 WL 1052030, at *1 (N.D.Ill. May 22, 2002) the plaintiff's attorney prepared the initial draft of the expert's report based on extensive discussions with the expert. The expert then revised the initial draft to develop the final version. The court concluded that "[s]ome of the language in the report may have been chosen by counsel in the first instance, but [the expert] was sufficiently involved in the preparation and revision of the report that it may fairly be considered as setting forth his opinions, not those of counsel." *Id.* The court added, "[w]e reject a formalistic approach which would require that the expert be the person who actually puts pen to paper (or fingers to keyboard)." *Id.; see also Clintec Nutrition Co. v. Baxa Corp.*, No. 94–7050, 1998 WL 560284, at *6 (N.D.Ill. Aug.26, 1998) (declining to exclude report despite expert's admission that he did not prepare the first draft of his report and that he prepared it with counsel's assistance); *Indiana Ins. Co. v. Hussey Seating Co.*, 176 F.R.D. 291, 292–93 (S.D.Ind. 1997) (characterizing expert's failure to sign report and personally prepare some of its sections as mere technical violations not meriting exclusion).

Paul Sweeney's testimony will be admitted in its entirety. Defendant PwC's Third Motion to Exclude the Testimony of Plaintiff's Retained Expert Paul Sweeney is DENIED.

#### (4) Loren Kramer

■ There is no dispute over Kramer's qualifications. He is an accountant with decades of distinguished service in that profession. Nevertheless, a portion of his testimony runs afoul of *Daubert* on account of the methodology he employed in reaching his conclusions.

Kramer prepared three reports on behalf of the Plaintiff: (1) a report on C & L's 1981 audit of Ambassador; (2) a report on C & L's 1982 audit of Ambassador; and, (3) a report to rebut criticisms of the first two reports by PwC's expert witness R. Larry Johnson.

> In his rebuttal report, Kramer observed: It is true that the excerpts in my report came from deposition summaries prepared by Plaintiff's counsel. Although at the time of my deposition it was my recollection that I had received the complete deposition transcripts three years earlier, I have been unable to find such transcripts in my records, and Plaintiff's counsel has been unable to find transmittal documents indicating that I received all the transcripts.

(Pl.'s Mem. in Opp. to PwC's Mot. to Exclude "Rebuttal Testimony", App. F at 200) ("Kramer Rebuttal").

In fact, PwC asserts—and Plaintiff does not dispute—that Kramer prepared his reports on the basis of statements prepared by Plaintiff's counsel about the testimony of only eight out of more than 150 deponents in this case. (PwC's Mot. to Exclude Kramer at 8). These eight witnesses were selected by Plaintiff and Kramer did not inquire to see the testimony of other witnesses. (Kramer Dep. 359–60, Kramer Rebuttal at 200). Among these eight, several were significant personnel in a position to have a strong grasp on the company's financial health. The former employees whose depositions Kramer reviewed were those of Daniel Lynch, Vice President of Underwriting (1979–1983), Joel Cooper, Underwriter (1975–1983), John Grossi, Vice President of Underwriting (April–December 1983),

Harry Guis, Vice President of Claims (1980–1983), Frank Sedlock, Claims Examiner (1980–1984), Edmund Powers, Claims Examiner and Supervisor (1980–1984), Wilbur Conklin, Claims Examiner, (1982–1984), and Elliot Doliner, Claims Examiner, Supervisor, Manager, and Superintendent (1970–1983). PwC asserts that Kramer's reliance upon filtered testimony of only a handful of witnesses runs afoul of *Daubert* and Fed.R.Evid. 703, which requires that the information upon which an expert relies in reaching his conclusions be reliable.

It is axiomatic that the information upon which an expert bases his opinion must be reliable. *In re TMI Litig.*, 193 F.3d at 697; *see also Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448–49 (3d Cir.2003) (excluding testimony on grounds that, *inter alia*, expert had based his opinion on a sampling of tapes selected by counsel). While Fed.R.Evid. 702 is the "primary locus" of a district court's gatekeeping function under *Daubert*, a court must also look to other rules, including Rule 703. *Montgomery County*, 320 F.3d at 448.

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to

evaluate the expert's opinion substantially outweighs their prejudicial effect. Fed.R.Evid. 703.

In *TMI*, the Third Circuit upheld the district court's decision to exclude the testimony of an expert witness on the grounds that the information provided to that witness was unreliable. *TMI*, 193 F.3d at 698. The witness, a doctor, had been provided by plaintiffs' counsel with medical history summaries prepared by counsel, and she based her conclusions on those summaries. *Id.* Although the summaries were based on interviews of patients composed of questions formulated by the doctor, the court still held that she should have conducted a more thorough analysis than simply relying on the patients' self-reports, and should have taken further steps such as examining the patients or reviewing their medical records. *Id.* In the absence of such probing by the expert, the court held that the information upon which she based her opinions was unreliable. *Id.*

Though not factually a perfect fit, *TMI* is applicable here to Kramer's reports. He, too, relied on summaries prepared by counsel. He, too, conducted little independent investigation into the witnesses beyond the summaries prepared for him. Beyond these facts, Kramer's examination of Ambassador's financial health may have been further skewed by the fact that, at least until he prepared his rebuttal report, he relied upon only eight of the more than 150 depositions taken in this case.

The Court has reviewed the deposition summaries of these experts included in Kramer's report. To be sure, these depositions contain much potentially damaging information, evidence that Plaintiff may introduce in pleading its case, and that presumably it believes will illustrate that C & L ought to have known about the sickly condition of Ambassador. But to make

Kramer the mouthpiece of these deponents, and to allow him to offer testimony to a jury as to conclusions he has reached on the basis of this highly filtered version of events, is unacceptable. Kramer's reliance upon the spoonfed depositions led him to draw questionable conclusions about Ambassador that he might not have drawn had he properly reviewed all of the depositions in an unfiltered fashion. As just one example, on the basis of the depositions of the eight former employees enumerated above, Kramer concludes in his report on the 1981 Audit that, "[p]rior to 1983, A[mbassador] I[nsurance] C[ompany] did not have an underwriting manual or written guidelines as to what was an acceptable risk." (Decl. of Jay Kelly Wright in Supp. of Fourth Mot. to Exclude Testimony, Ex. A.) ("Kramer Report"). However, five other deponents who were not included in the eight reviewed by Kramer—Dirk Rosenkrans, Senior Underwriter; Alexander Hames, Florida Underwriting Manager; Joseph Maresca an employee of agent and director of Horizon Insurance Company, an Ambassador subsidiary, and Ambassador General; Charles McCloskey, employee of agent; and Arnold Chait himself—all testified that Ambassador had underwriting manuals and/or guidelines.[6] (Kramer Rebuttal at 2 n. 3). Whether or not there actually was an underwriting manual or guidelines is a question of fact to be decided by a jury, and not relevant here. That Kramer made such an unqualified and readily contradicted statement regarding the existence of an underwriting manual or set of guidelines illustrates the perils of relying on evidence hand-selected and even edited by counsel. By reviewing only those depositions provided to him by Plaintiff's counsel, and by reviewing what appears to be for the most part only preselected excerpts of those depositions, Kramer relied upon information that is simply too unreliable to be trusted.

Moreover, Kramer's attempt to remedy this error on rebuttal is unacceptable, since such efforts exceed the scope of proper rebuttal. Kramer's rebuttal testimony is discussed in further detail below, at section II.C.6. Accordingly, Kramer's testimony will be limited to his analysis of C & L's audit workpapers. He will not be permitted to testify about what he discovered in any of the depositions, nor will he be permitted to testify as to any conclusions he derived that were in any way based on his review of the depositions and the summaries.

Therefore, Defendant PwC's Fourth Motion to Exclude the Testimony of Plaintiff's Retained Expert Loren Kramer is GRANTED IN PART AND DENIED IN PART. Kramer is barred from testifying as to any conclusions that are based on his review of depositions and the summaries of the depositions. He will only be permitted to testify on his analysis of C & L's audit workpapers.

(5) Dale Ogden and Susan Szkoda

a. Loss Reserves

■ Experts Dale Ogden and Susan Szkoda opine for Plaintiff on the condition of Ambassador's loss reserves. Generally, premiums to insurance companies are paid up front to cover future events. An insurance carrier's exposure may last several years after the premium is paid. Months or years can pass before an insurance claim is resolved by settlement or litigation. Because of the up front payment of

---

**6.** John Grossi, one of the deponents included in the original eight, also testified that Ambassador had an underwriting manual. Kramer characterizes as "somewhat unclear" Grossi's testimony in this regard. (Kramer Rebuttal at 2 n. 3).

a premium, accounting principles require that insurance companies estimate what it will cost to handle claims ultimately asserted under the policy and to match that estimate against the premium in the year the premium is earned. These estimates of future liabilities are called "claims costs" or "loss reserves." These reserves are not actual reserves of funds but merely represent a liability on the insurance company's balance sheet. Such reserves are generally subdivided even further, into "losses" which constitute indemnity payments an uninsured is required to make, and "loss adjustment expenses" ("LAE") which are expenses associated with investigating and handling a claim. Loss reserves are to be recorded on a balance sheet at full value, not discounted to reflect the time value of money. *Delta Holdings v. Nat'l Distillers & Chem. Corp.*, 945 F.2d 1226, 1229 (2d Cir.1991); *see also Atl. Mut. Ins. Co. v. Comm'r of Internal Revenue*, 111 F.3d 1056, 1057–58 & n. 1 (3d Cir. 1997). Loss reserve estimates are re-examined at least annually and may be revised in light of additional experience.

Plaintiff alleges that the loss reserve estimates made by Ambassador at the end of 1981 were too low, and that Ambassador's management was aware of this. Plaintiff further alleges that C & L was negligent in failing to reach that conclusion when it conducted its audit of the 1981 financial statements. Plaintiff makes similar allegations against Ambassador's management and C & L regarding the 1982 financial statements.

In November 1983, Plaintiff asked Kramer Capital Consultants ("KCC") to conduct an independent examination of Ambassador's loss reserve liabilities as of November 1983. In early 1984, Dale Ogden, a casualty actuary at KCC, performed this study. Ogden prepared a report analyzing Ambassador's loss and LAE reserves as of December 31, 1983. (Pl.'s Mem. in Opp. to PwC's Fifth Mot. to Exclude, App. D at 9) ("Ogden Rebuttal"). Ogden determined the insolvency was too great and that Ambassador could not be rehabilitated. (*Id.*) Plaintiff then asked the accounting firm of Price Waterhouse to review KCC's ultimate findings, and as part of that effort, Price Waterhouse's casualty actuary, Susan Szkoda, reviewed Ogden's work. Szkoda confirmed Ogden's findings.

In 2000, the Plaintiff again hired Ogden and Szkoda to calculate Ambassador's loss reserves, using only data available to the company and to the industry as of December 31, 1981. (Pl. Mem. in Opp. to PwC's Mot. to Exclude Ogden/Szkoda at 6.) They did a similar analysis for year-end 1982. Their work purportedly shows that Ambassador's loss reserve liabilities at year-end 1981 made the company virtually insolvent.

b. Legal Analysis

PwC asserts that the testimony of both Ogden and Szkoda should be barred on *Daubert* grounds. Specifically, PwC argues that Ogden and Szkoda are not qualified, that their testimony does not fit the disputed factual issues in this case, and that their methods are subjective, result-oriented, and inconsistent.

PwC admits that Ogden and Szkoda are "qualified to opine on loss reserving methods and loss reserve adequacy." (PwC's Fifth Mot. at 14). Nevertheless, PwC asserts that because Ogden and Szkoda are actuaries, not Certified Public Accountants, they are therefore unqualified to opine on C & L's *audits* of Ambassador and its loss reserves, even where the audits reviewed the work of actuaries.

C & L's loss reserve audit was overseen by C & L partner Paul Malvasio, an auditor, who chose not to employ an actuary to

assist him in calculating Ambassador's loss reserves. (Pl.'s Mem in Opp. to Mot. to Exclude Ogden and Szkoda at 10–11). Malvasio claimed he had the necessary loss reserve expertise himself, an expertise which is admittedly actuarial in nature. (Malvasio Dep. at 29–30). PwC's own expert Larry Johnson is of the opinion that "Malvasio met the requirements of what even today would constitute a loss reserve specialist." (Malvasio Dep. at 100). It is therefore both strange and self-defeating that PwC should object to an actuary reviewing the work of an auditor that arguably should have been performed by an actuary, and that was performed by an auditor who himself claimed he had the relevant expertise of an actuary. If someone sued an auto mechanic who had performed a root canal on the grounds that the root canal was negligently performed, the mechanic could not object when the plaintiff had the gall to hire a dentist to show that the mechanic botched the operation.

Ogden and Szkoda are qualified to state whether or not someone who was looking in the right place and knew what they were doing would become alarmed at the state of Ambassador's loss reserves. If, as Plaintiff asserts, C & L was negligent in failing to discover that Ambassador's loss reserves were woefully inadequate, it is obvious that an actuarial assessment of those loss reserves is relevant. PwC even acknowledges that as of 1992, professional accounting standards *require* that a loss reserve specialist be used in audits of property and casualty insurance companies. (PwC Fifth Mot. at 13 n. 7). To assert, then, that a factfinder should be prevented from hearing the testimony of such specialists is dubious at best. The fact that failure to utilize a loss reserve specialist in an audit of this type did not become per se negligent until 1992 does not mean that the same failure was not

negligent in 1981. Whether Ambassador set its reserves properly or used proper actuarial methods at the time is certainly relevant not only insofar as it concerns defendant Ambassador, but insofar as it may be used to show that C & L's audit of Ambassador failed to comply with Generally Accepted Auditing Standards. Ultimately, of course, it is the latter issue that will determine PwC's liability, if any. But PwC's concern that a jury will necessarily confuse the standards applied to a reasonable actuary and the standards applied to a reasonable accountant is misplaced, and in any event can be cured by remedies far less harsh than exclusion of the testimony.

■ Next, PwC charges that Ogden and Szkoda employed subjective and results-oriented methods. "Submerged in the text of their reports and their numerical exhibits is the enormous amount of *subjective judgment* that was interjected by these individuals when deriving their results." (PwC Mot. at 16) (emphasis supplied). That an expert injects personal judgment in the course of offering his testimony is hardly grounds for excluding that testimony. Judgments must inevitably be made in the use of loss reserve calculations, and no actuarial method is so accurate as to eliminate some use of subjective judgment in the estimation of future claims. *Delta Holdings*, 945 F.2d at 1231 ("[R]egardless of the actuarial method used, the preparation of, and reliance upon a net worth calculation in a balance sheet for a casualty risk reinsurer is based in large part upon informed guesswork.") PwC's totally unforgiving stance—that any subjective judgment must be excluded—is simply not called for by *Daubert*.

PwC likewise opposes Ogden and Szkoda's loss reserve projections conducted in 2000, projecting back to 1983. The primary source of PwC's skepticism of Ogden

and Szkoda is that "it is simply too convenient, too perfect, that their brainwashed 'reasonable' estimates turn out to be exactly the results achieved by the company after 20 years of actual events." (PwC Fifth Mot. to Exclude at 23.) Basically, PwC suggests that Ogden and Szkoda unfairly had the answers to the test before they took it. Plaintiff counters that "it is difficult to imagine anything more sharply turning *Daubert* on its head than the suggestion that an expert's estimates are inadmissible because actual events ultimately proved them *accurate*." (Pl.'s Mem. in Opp. at 16.) (emphasis supplied). The Court agrees. Certainly, Ogden and Szkoda's projections are surprisingly accurate, arguably to the point of being suspicious, given the complexity of the actuarial endeavor. But this Court is not prepared to declare that the actuarial endeavor—arguably the core enterprise of the entire insurance industry—is in fact such a sham that the possibility that someone got it right is so impossible to believe that a jury must be prevented from hearing it. This issue is ripe for cross-examination, not *Daubert* exclusion.

PwC further stresses that Ogden and Szkoda's reports must be excluded because their 2000 estimates differ from their 1984 estimates, and because their estimates are inconsistent with one another's. There is, not surprisingly, disagreement between the parties as to whether or not Ogden and Szkoda disagree. PwC points to several parts of the Ogden and Szkoda studies where disagreements can be found; Plaintiff points to the remarkable similarity between Ogden and Szkoda's estimates of loss reserve deficiency for the general liability line at 12/31/81, $26 million for Ogden and $28 million for Szkoda. The Court, having reviewed the reports, concludes that to the extent there is disagreement between Ogden and Szkoda, both of their reports fall within "the range where

experts might reasonably differ." *Kumho Tire*, 526 U.S. at 153, 119 S.Ct. 1167.

■ Finally, PwC objects to the admission of Ogden's reports on the grounds that the reports improperly draw legal conclusions, use legal terminology, and speak in terms of legal duties. (PwC Fifth Mot. to Exclude at 31). While it is impermissible for a witness to testify as to the governing law since it is the court's duty to explain the law to the jury, the Third Circuit has allowed expert testimony concerning business customs and practices. *United States v. Leo*, 941 F.2d 181, 196–97 (3d Cir.1991); *see also First Nat'l State Bank v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir.1981) (per curiam) (allowing admission of evidence of customs and practices in the banking industry). The Court has no intention of allowing any expert in this case to usurp its rightful role to instruct the jury on the law. Counsel on both sides are free to object at trial where they believe a witness's testimony has strayed out of bounds and into the rightful territory of the Court. But the Court is not prepared to exclude Ogden's reports on *Daubert* grounds merely because he made occasional use of the word "negligent" or the phrase "should have known." (PwC's Fifth Mot. at 32).

Therefore, PwC's Fifth Motion to Exclude the Testimony of Dale Ogden and Susan Szkoda is DENIED.

### (6) Rebuttal Testimony

■ Fed.R.Civ.P. 26(a)(2)(C) allows rebuttal testimony if the evidence is intended "solely to contradict or rebut" other expert testimony. At trial, rebuttal evidence is limited "to that which is precisely directed to rebutting new matter or new theories presented by the defendant's case-in-chief." *Step–Saver Data Sys., Inc. v. Wyse Tech.*, 752 F.Supp. 181, 193 (E.D.Pa.

1990), *aff'd in relevant part and rev'd in part on other grounds*, 939 F.2d 91 (3d Cir.1991). The admissibility of evidence in rebuttal is committed to the discretion of the trial judge. *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir.1974) Rebuttal evidence is properly admissible when it will "explain, repel, counteract or disprove the evidence of the adverse party." *Id.* It is not "an opportunity for the correction of any oversights in the plaintiff's case in chief." *Step–Saver Data Sys.*, 752 F.Supp. at 193.

■ PwC objects to Susan Szkoda's rebuttal testimony. Specifically, PwC objects to Szkoda's attachment to her rebuttal report of a transcript from a loss reserve conference held in September 1984 under the auspices of the Casualty Actuarial Society. Szkoda included the transcript in rebuttal to a criticism made by PwC's expert Richard Sherman, who criticized the standards employed by Szkoda in assessing C & L's loss reserve methodology. Sherman claimed Szkoda applied standards that were not in use in 1981 and 1982 when C & L performed its work. Szkoda responded that in fact the standards she applied were in use in 1981 and 1982, and she utilized the transcript of the September 1984 symposium of the American Academy of Actuaries to prove it.

PwC argues that Szkoda did not cite actuarial literature in her initial 2000 report to provide the basis for the standards she applied when critiquing C & L (PwC Mot. to Exclude Rebuttal Testimony at 4), even though she had the transcript in her possession at the time she filed her 2000 report and could have included it. Because she could have included it earlier and failed to do so, PwC argues the attached transcript should be barred. The Court disagrees. Plaintiff correctly asserts that PwC's reading of what is permissible on rebuttal is substantially more narrow than the Third Circuit's. The Third Circuit's rule does not automatically exclude anything an expert could have included in his or her original report. Such a rule would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would forever bar the expert from later introducing the relevant material. All that is required is for the information to repel other expert testimony, as Szkoda's inclusion of the attachment does. The Court will not exclude the attached transcript.

PwC also seeks exclusion of the rebuttal testimony of Loren Kramer. In his rebuttal, Kramer claims he has since reviewed 30 more depositions in addition to the eight deposition summaries he reviewed and relied upon initially. This Court has already barred Kramer from testifying in reliance upon the summaries of the eight depositions discussed above and it will likewise bar Kramer from testifying on the additional 30 depositions he reviewed for his rebuttal report. Unlike Szkoda's attachment of a transcript directly responsive to Sherman's criticism, Kramer ought to have known that he should not have relied on just eight depositions that were summarized by Plaintiff's counsel in rendering his original report. Rebuttal testimony does not give him a chance for a "do over."

As for Kramer's inclusion of a new chart in his rebuttal report on Ambassador's handling of medical malpractice claims, the Court will allow it into evidence. In his initial reports, Kramer criticized C & L for accepting Ambassador's management's representations that its loss reserves on medical malpractice claims were justifiably lower than the industry's standard because people sued doctors, not hospitals, for medical malpractice. (Pl.'s

Mem. in Opp. to PwC's Mot. to Exclude Rebuttal Testimony at 5). Ambassador told C & L it insured only hospitals. (*Id.*) Ambassador further told C & L that its medical malpractice losses would stop increasing after eight years. (*Id.*) Kramer criticized C & L for allegedly accepting these representations without proof or independent corroboration. (*Id.*) PwC's expert Larry Johnson defended C & L's decision not to challenge Ambassador's medical malpractice loss ratios and the eight-year tail factor. (Johnson Rep. at 338–39, 341; Johnson 10/09/02 Dep. at 438–41). Kramer in turn created Exhibit 5.4 to his rebuttal report which illustrated that: (1) Ambassador did in fact insure doctors in addition to hospitals; and (2) hospitals do get sued when doctors get sued. (Kramer Rebuttal, Ex. 5.4). These points are in fact directly targeted to rebut Johnson's own testimony. Accordingly, the Court will admit the exhibit.

 (7) Joinder of Defendants Doris June Chait, the Estate of Arnold Chait, Richard A Tafro, and Ambassador Group, Inc.

Defendants Doris June Chait, the Estate of Arnold Chait, Richard A Tafro, and Ambassador Group, Inc. ("the Ambassador Defendants") submitted a notice of joinder in the motions of PwC to exclude the testimony of Plaintiff's experts. No party has expressed opposition to the joinder. Accordingly, except where specifically stated, the Ambassador Defendants are bound by the Court's rulings on PwC's motions.

 (8) Plaintiff's Motion to Exclude PwC's Experts R. Larry Johnson and Daniel Fischel

 a. R. Larry Johnson

■ Though the parties have been given more than ample opportunity to express themselves, opining at great length on their complex views of *Daubert,* both sides' interpretation of that seminal Supreme Court case may be summarized in one sentence: "my experts are qualified because they're mine, yours aren't because they're yours."

Plaintiff seeks to exclude the testimony of PwC's expert R. Larry Johnson on the grounds that Johnson is not qualified to testify. Johnson is a certified public accountant and auditor, specializing in insurance. (Johnson Rep. 5–7 & Ex. A). He is the managing partner of Johnson Lambert & Co., an accounting firm, and Veris Consulting, LLC, a consulting practice. Licensed in the State of Maryland, he is a member of the American Institute of Certified Public Accountants (AICPA). He has served as a member of several standards-setting bodies including, for 7 years and 2 terms, the Insurance Company Committee, which was responsible for developing accounting standards for the U.S. insurance industry and coordinating accounting practices with representatives of the National Association of Insurance Commissioners. He has served as a member of the AICPA's Accounting Standards Executive Committee. He has served as a member of the AICPA's Committee on Relations with Actuaries. Johnson previously served on an AICPA task force that addressed audit requirements for loss reserves of property and casualty companies, which resulted in the issuance in 1992 of the Statement of Position on auditing loss reserves known as SOP 92–4. He authored the estimating methods discussion in that SOP.

In his 34 years as an accountant he was involved in audits of more than 50 insurance companies, including companies that wrote property and casualty insurance, medical malpractice insurance, automobile insurance, and various other lines of liability insurance. He has evaluated compliance

with GAAP, GAAS and Statutory Accounting Practices. He has served state insurance regulators like Plaintiff, including work in connection with lawsuits they brought as receivers of failed insurance companies. He has provided expert services to the Departments of Insurance of California, Illinois, Connecticut, Rhode Island, Kentucky, Ohio, Kansas and Pennsylvania in lawsuits they brought as receivers of failed insurance companies against the companies' independent outside auditors and others.

Plaintiff seeks to preclude Johnson's testimony on the subjects of underwriting and claims management because Johnson is neither an underwriter nor a claims manager, and therefore, he is unqualified to testify on these subjects. Plaintiff argues that PwC improperly presents Johnson as a "generic expert" in all things related to the case. The Court disagrees with this characterization. Plaintiff's complaint against PwC is that it negligently audited Ambassador in 1981 and 1982. It is difficult to think of a more appropriate expert to testify on the subject than an experienced insurance auditor. Even if it is assumed, *arguendo*, that Johnson has less experience than Walsh and McAlear with underwriting, and less experience than Cerone on the subject of managing claims, he is eminently qualified to opine on what a reasonable auditor ought to have done with the information Plaintiff's experts claim C & L had at its disposal at the time of the 1981 and 1982 audits. *See Proto-Comm Corp. v. Novell Advanced Services, Inc.,* 171 F.Supp.2d 473, 478–79 (E.D.Pa. 2001) (denying motion to exclude accountant as unqualified where expert had "specialized knowledge ... beyond that of the average layman in the areas most relevant to th[e] case.")

Plaintiff also argues that Johnson should be precluded from offering hearsay testimony, summarizing evidence, and opining on the credibility or consistency of testimony. To be sure, an expert may not be used simply as a vehicle for the admission into evidence of otherwise inadmissible hearsay testimony. *United States v. Tomasian,* 784 F.2d 782, 786 (7th Cir.1986) ("Rule 703 does not sanction the simple transmission of hearsay; it only permits an expert opinion based on hearsay."); *see also* 29 C. Wright & V. Gold, Federal Practice & Procedure, § 6273, p. 312 (1997) ("Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury.") Neither Johnson nor any of the other expert witnesses will be permitted to do so.

Likewise, neither Johnson nor any other witness will be permitted to simply summarize the facts and the depositions of others. Such testimony comes "dangerously close to usurping the jury's function" and "implicates Rule 403 as a 'needless presentation of cumulative evidence' and 'a waste of time.'" *United States v. Dukagjini,* 326 F.3d 45, 54 (2d Cir.2003); *see also Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir.1992) ("Stated more directly, the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument."); *SEC v. Lipson,* 46 F.Supp.2d 758, 763 (N.D.Ill. 1998) ("Expert testimony may not be used merely to repeat or summarize what the jury independently has the ability to understand."). Indeed, the Court has already barred Kramer from testifying at least in part for the same reason. Finally, no expert, including Johnson, will be permitted to opine on the credibility or consistency of others' testimony. Listening to testimony and deciding whether it is contradictory is the "quintessential jury func-

tion of determining credibility of witnesses." *Lipson*, 46 F.Supp.2d at 763. An expert may not substitute his judgment for the jury's. "When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determinations." *United States v. Jacques Dessange, Inc.*, No. S299CR1182, 2000 WL 294849, at *2, 2000 U.S. Dist. LEXIS 3597, at *2 (S.D.N.Y. March 21, 2000).

Still, while Johnson will be precluded from so testifying, this limitation in no way calls for the wholesale exclusion of other parts of his testimony.

### b. Daniel R. Fischel

Plaintiff asserts that the testimony of PwC's expert Professor Daniel R. Fischel should be excluded because he is unqualified to testify.

Professor Fischel's area of expertise is economics. He holds a faculty position at the University of Chicago, having served both its law school and its graduate school of business. He was once dean of the law school. He is the author of more than fifty books and articles most of which address the application of economic principles and analysis to legal issues or cases. His books and articles have been cited over 100 times by various courts including both the United States Supreme Court and the Third Circuit. *See, e.g., Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *Basic Inc. v. Levinson*, 485 U.S. 224, 226 n. 24, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Edgar v. MITE Corp.*, 457 U.S. 624, 643–44, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 179 n. 9 (3d Cir.2000); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir.

1997). He has testified at over 100 cases in the last 20 years. (Fischel Rep. 6–19).

Plaintiff's objections to Fischel largely echo those he levied against Johnson, namely, that Fischel's expertise, "whatever [it] is ... is not accounting; it is not insurance regulation; it is not insurance company management; it is not loss reserving; and it is not excess and surplus lines insurance." (Pl.'s Mot. to Exclude at 2.) PwC counters that Fischel is an expert in economics, and that Plaintiff's allegations directly implicate assertions about how economic markets work and how actors within those markets behave. For example, Plaintiff's motion states: "[w]e contend here that, in order to grow the balance sheet, probably to sell the company, Chait began a period of rapid and reckless growth of Ambassador." (*Id.*) George Bernstein, a consultant to the Plaintiff, has testified that he believes that Ambassador's CEO entered into a conspiracy with North American Reinsurance Company to deliberately accept insurance that would result in a loss in an effort to fool market participants who would supposedly only focus on gross revenue rather than profits or losses. Plaintiff's experts also criticize Ambassador's use of managing general agents (MGAs), who are paid on commission up front and therefore, Plaintiff argues, operated under an obvious conflict of interest that should have been a red flag to auditors.

PwC intends to use Fischel to demonstrate the implausibility of a scenario in which senior management of Ambassador would attempt to enhance the sale value of a company by deliberately accepting insurance coverage that would result in inevitable losses for the company. (PwC Mem. in Opp. at 28). "The plausibility or implausibility of such a scenario is relevant to respond to an argument by the Plaintiff that an outside auditor in the position of

Coopers should begin an audit by being on the lookout for management conduct that is designed to lose money instead of make money." (*Id.*) Likewise, PwC intends to use Fischel to demonstrate that the use of MGAs does not create a clearcut conflict of interest, as Plaintiff contends. The Court rejects Plaintiff's argument that these assertions are common sense, finding that such testimony would render substantial assistance to the jury in rendering its decision. Fischel's expertise in economics qualifies him to testify in this case; his testimony is relevant and fits the case in compliance with *Daubert*.

Accordingly, Plaintiff's Motion to Exclude the Testimony of Defendant PwC's Experts R. Larry Johnson and Daniel R. Fischel is GRANTED IN PART AND DENIED IN PART; Johnson will not be permitted to offer hearsay testimony, to summarize evidence, to opine on the credibility or consistency of witness testimony, or to summarize the facts and the depositions of others; Daniel R. Fischel's testimony will be admitted in its entirety.

### III. CONCLUSION

For the aforementioned reasons, it is on this *16th* day of March, 2004 hereby ORDERED that:

1. Defendant PwC's First Motion to Exclude the Testimony of Plaintiff's Retained Experts Joseph Walsh and Charles McAlear is DENIED.

2. Defendant PwC's Second Motion to Exclude the Testimony of Plaintiff's Retained Expert James F. Cerone is GRANTED IN PART AND DENIED IN PART. Cerone's testimony regarding information that postdates December 31, 1982 may not be used as evidence against Defendant PwC, although his report may be used in its entirety against the remaining defendants. To the extent Cerone's report relies on selected deposition testi-

mony given to him by Plaintiff's attorney, it is barred, and to the extent it relies upon his own independent analysis of Ambassador's claims files, it is admitted.

3. Defendant PwC's Third Motion to Exclude the Testimony of Plaintiff's Retained Expert Paul Sweeney is DENIED.

4. Defendant PwC's Fourth Motion to Exclude the Testimony of Plaintiff's Retained Expert Loren Kramer is GRANTED IN PART AND DENIED IN PART. Kramer is barred from testifying as to any conclusions that are based on his review of depositions and summaries of the depositions. He will only be permitted to testify on his analysis of C & L's audit workpapers.

5. Defendant PwC's Fifth Motion to Exclude the Testimony of Plaintiff's Retained Experts Dale Ogden and Susan Szkoda is DENIED.

6. Defendant PwC's Motion to Exclude Certain "Rebuttal" Testimony of Plaintiff's Retained Expert is GRANTED IN PART AND DENIED IN PART. Susan Szkoda's inclusion of a transcript from a loss reserve conference of the Casualty Actuarial Society is admitted; Loren Kramer is barred from testifying as to the additional depositions he reviewed for rebuttal, but he will be permitted to include the new chart on medical malpractice designated as Exhibit 5.4.

7. Joinder of Defendants Doris June Chait, the Estate of Arnold Chait, Richard A Tafro, and Ambassador Group, Inc. is allowed without objection.

8. Plaintiff's Motion to Exclude the Testimony of Defendant PwC's Experts R. Larry Johnson and Daniel R. Fischel is GRANTED IN PART AND DENIED IN PART. Johnson will not be permitted to offer hearsay testimony, to summarize evidence, to opine on the credibility or consis-

tency of witness testimony, or to summarize the facts and the depositions of others. Daniel R. Fischel's testimony will be admitted in its entirety.